**UNITED STATES of America,**

v.

**Anthony GALLAGHER, Donald Carson, Defendants.**

**Crim. No. 86–340.**

United States District Court,
D. New Jersey.

Nov. 21, 1990.

As Changed Nov. 29 and Dec. 5, 1990.

Michael Chertoff, U.S. Atty. by Melvin Kracov, Asst. U.S. Atty., Newark, for the Government.

Edward A. Hartnett, Robinson, St. John & Wayne, Newark, N.J., for defendant Anthony Gallagher.

Fredric J. Gross, Mount Ephraim, N.J., for defendant Donald Carson.

## OPINION

DEBEVOISE, District Judge.

### A. BACKGROUND

Defendants, Anthony Gallagher and Donald Carson, were convicted of conspiracy in violation of 18 U.S.C. § 1962(d) in conducting the affairs of the "John DiGilio Group" through a pattern of racketeering manifested by the payment of money by United Terminals, Inc., a stevedoring company, and its receipt by Carson, an official of the International Longshoremen's Association ("ILA") in violation of the Taft–Hartley Act, 29 U.S.C. § 186. They were also convicted of conspiracy to extort money from United Terminals, Inc., in violation of the Hobbs Act, 18 U.S.C. § 1951. During the trial of the case the government introduced extensive electronic surveillance evidence.

Prior to trial Gallagher and Carson moved to suppress the electronic surveillance evidence. One of the grounds of their motion was that the government had not complied with the sealing requirements of 18 U.S.C. § 2518(8)(a) and had failed to provide a satisfactory explanation for its non-compliance. There was no evidence that the physical integrity of the wiretap tapes had been compromised, and consequently I denied the suppression motion, relying on the Third Circuit opinion in *United States v. Falcone*, 505 F.2d 478 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975).

The Third Circuit affirmed the judgment of conviction, 870 F.2d 652, (1989) and Gallagher filed a petition for a writ of certiorari in the United States Supreme Court. On April 30, 1990 the Supreme Court decided *United States v. Rios,* —

U.S. ——, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990) in which it rejected the Third Circuit's interpretation of 18 U.S.C. § 2518(8)(a). Thereafter, the Supreme Court vacated the Third Circuit's judgment affirming Gallagher's conviction and remanded the case for further consideration in light of *Rios,* —— U.S. ——, 110 S.Ct. 2162, 109 L.Ed.2d 492 (1990).

Carson, who had not filed a petition for a writ of certiorari following the Third Circuit's affirmance of his conviction, moved to recall the Third Circuit's mandate and for reconsideration.

The pertinent provision of § 2518(8)(a) requires that "immediately" upon the expiration of an order authorizing surveillance (or extensions thereof), the recordings shall be made available to the judge who issued the order "and sealed under his direction." At issue in *Rios* was the interpretation of the language of the statute which provides:

> "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517."

18 U.S.C. § 2518(8)(a).

The Supreme Court concluded "that the 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the government explain not only why a delay occurred but also why it is excusable." 110 S.Ct. at 1850.

On remand before the Third Circuit the government had no alternative but to concede that I had not applied the legal standard set forth in *Rios* when I rejected Gallagher's and Carson's contention that the electronic surveillance evidence should be suppressed because of the government's failure to seal the tapes immediately. The government urged that the Third Circuit remand the case to this court for fact finding on the issue of whether there was a satisfactory explanation for the delays in sealing the tapes. 909 F.2d 1478 (1990). Gallagher urged that the government should not be permitted to offer explana-

tions additional to or different from those given at the suppression hearing and that since the adequacy of the government's explanation is a question of law there was no reason to remand to the district court.

The Third Circuit granted Carson's application to recall the mandate to this court and treated him in the same manner as it treated Gallagher. The Third Circuit 909 F.2d 1477 (1990) remanded the case to this court to consider (i) whether the government should be permitted to offer explanations additional to or different from those it gave at the suppression hearing and (ii) whether in the light of *Rios* the government has offered a satisfactory explanation for the delay in sealing the tapes.

On October 12 and 19, 1990 a hearing was held. Gallagher and Carson objected to the government introducing evidence to explain the sealing delays. Without deciding whether such evidence could be considered in connection with the satisfactory explanation question, I admitted it. I did this for two reasons. First, even if I ultimately conclude that the evidence could not be considered, there would be a complete record on the likely appeal of my decision. Second, the nature of the evidence might determine whether it should be considered, and at the very least, presentation of the evidence at the hearing could serve the function of a proffer.

### B. CONSIDERATION OF ADDITIONAL EVIDENCE

■ Gallagher and Carson contend that the government cannot be permitted to introduce evidence at this stage of the proceedings to explain why the surveillance tapes were not sealed "immediately." Relying on *Rios,* they argue: "The Supreme Court was quite explicit on this point: the 'explanation is not "satisfactory" within the meaning of the statute unless it was relied on at the suppression hearing to explain the sealing delays.' *Id.* 110 S.Ct. at 1851. The Supreme Court remanded in *Rios,* not to allow the government to bolster its explanation, but for a determination of what explanation the government

had supplied at the suppression hearing. *Id.* Justice O'Connor, joined by Justice Blackmun, added a concurring opinion to drive the point home in which they emphasized that a post-hoc explanation cannot be considered a satisfactory one." (Gallagher Brief at 12, 13).

The government notes a difference between *Rios* and the present case. *Rios* arose in the Second Circuit which had rejected the *Falcone* rule and which required that the government provide a satisfactory explanation if it wished to offer the tapes in evidence. Of necessity the government in that case had to present evidence at the suppression hearing setting forth its satisfactory explanation. The government further notes that in the present case, relying on the Third Circuit *Falcone* rule, it was under no compulsion to explicate and prove its satisfactory explanation at the suppression hearing, because it could defeat the motion simply by establishing that the physical integrity of the tapes had not been compromised.

After Gallagher and Carson raised their objection to an evidentiary hearing here, the Third Circuit had occasion to rule on the question in *United States v. Vastola,* 915 F.2d 865 (3d Cir.1990). There the defendants and the government advanced arguments similar to those advanced here. The Court stated that "[w]e do not consider this difference between the two cases [*Rios* and *Vastola* ] to be significant on this issue of whether the government should now be able to explain the delay in the district court." 915 F.2d at 876. However, the Court also stated that, "[a]lthough we do not at this time accept the government's explanation for the delay, we find that its failure in the district court to offer evidence concerning the circumstances of the sealing delay should not necessarily now foreclose it from offering such evidence before the district court." Id at 876.

Commenting further on the question of permitting the government to offer additional evidence, the Court stated:

> In this case, while it is possible that the government offered no explanation for the delay because it had none, it is also possible that, acting in reasonable reliance on *Falcone,* it assumed that it could defeat the suppression motion by demonstrating the integrity of the tapes and thus did not find it necessary to introduce evidence on this point. Accordingly, we conclude that the district court should be entitled to exercise its discretion to decide whether the government should now be permitted, under *Rios,* to offer an explanation for its violation of the sealing requirement. It seems to us that this threshold determination should be made by the district court rather than by us as the nature of the determination is similar to that on a ruling on a motion by the government to reopen, traditionally a discretionary matter for the district court. *See United States v. Blankenship,* 775 F.2d 735, 740–41 (6th Cir.1985).

Id at 876.

In *Blankenship* the district court, without ruling on defendant's motion for a judgment of acquittal after the close of the government's case, permitted the government, after resting, to reopen its case in chief in order to introduce evidence establishing an essential element of the offense charged. The Sixth Circuit Court of Appeals ruled that the district court did not abuse its discretion. It noted the factors which the district court was required to consider when exercising its discretion: (i) the timeliness of the motion, (ii) the character of the testimony and the effect of granting the motion, (iii) the reason for failing to present the evidence during the party's case in chief and (iv) the relevance, admissibility, technical adequacy, and helpfulness to the jury in ascertaining the guilt or innocence of the accused. Further, the Court observed that "[t]he belated receipt of such testimony should not 'imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.' *United States v. Larson,* 596 F.2d 759, 778 (8th Cir.1979)." *Id.* at 741.

The criteria set forth in *Blankenship* were applied to the trial of a criminal case. Some are not relevant to a suppression

hearing, but most can be adapted to that kind of a proceeding.

Applying these criteria, I conclude that the government should be permitted to give evidence disclosing the reasons for the delay in sealing the pertinent tapes and addressing the question of whether the delay was excusable.

The government's application to introduce the additional evidence is timely. There was no reason to introduce it at the original suppression hearing, because under the then prevailing *Falcone* rule the motion could be decided without such evidence. Only after the decision in *Rios* and its rejection of the *Falcone* rule did the evidence become relevant. The government offered the evidence at its first opportunity to do so—at the hearing on remand from the Third Circuit.

The evidence is testimonial and documentary in nature—primarily the testimony of the two government attorneys responsible for sealing the tapes and the records which reflect their actions. The effect of the evidence is to fill a void, providing the information which must be considered when determining whether the standards of admissibility set forth in *Rios* have been met.

The reason why the government did not present this evidence at the suppression hearing is that under then-prevailing law in this circuit the evidence was unnecessary for a resolution of the motion, a legitimate reason. On the other hand, now that the law in this circuit has been changed by the Supreme Court's decision in *Rios*, the merits of a motion to suppress the surveillance tapes cannot be addressed without receipt of the evidence. The evidence is clearly relevant and admissible.

There is no risk that receipt of the evidence at this time will give it distorted importance or will prejudice Gallagher's or Carson's case. It will simply show whether the tapes in question should or should not have been admitted in evidence at the trial in which they were found to be guilty. Defense counsel have had ample opportunity to review the evidence which the government has offered and to meet it.

Thus, applying the *Blankenship* criteria, there is no reason why the government should not be permitted to produce evidence relating to the circumstances of the sealing of the tapes.

## C. SEALING THE TAPES

### 1. *General Information*

Attached to this opinion are Government Exhibit 2 (G2) and Defense Exhibit 1 (D1).

The three premises pertinent to these proceedings were the subject of electronic surveillance during the period from October 1, 1981 when the first wiretap order was signed until December 22, 1982 when the last tapes were sealed. G2 is a diagram which notes each of the premises involved: (i) the Zax apartment, (ii) the Gallagher home and (iii) the Bronson office. With respect to each of the premises G2 shows the date of each surveillance order and extension thereof, the time gap between the expiration of each order and an extension thereof and the date of sealing the tapes obtained from the surveillance of each of the premises.

D1 lists the twenty-two tapes introduced into evidence at the trial. The second column of the exhibit sets forth as to each tape the date when the surveillance order expired. The third column sets forth as to each tape the date when the tape was sealed. The fourth column sets forth the delay in sealing each tape according to the view held by Assistant United States Attorney Robert C. Stewart during the 1981–82 period. The fifth column sets forth the delay in sealing each tape according to the defense view of the law.

At the outset of the John DiGilio Group investigation responsibility for administration of the electronic surveillance was assigned to Assistant United States Attorney Robert C. Stewart. Later, although Stewart remained in overall charge of the investigation, responsibility for electronic surveillance was assigned to Assistant United States Attorney Warren S. Robins. Each had somewhat different views about the sealing requirements under § 2518(8)(a).

Stewart had been employed by the Department of Justice and stationed in the New York City office since 1971. In 1978 he joined the Department's Strike Force in New Jersey and in 1981 and 1982 was in charge of the Strike Force. He drafted the original application, underlying affidavit and order for the DiGilio Group electronic surveillance and for some of the subsequent extensions. He had overall supervisory responsibility for the conduct of the investigation from its inception until its conclusion.

Stewart testified about the procedure which he followed when seeking authorization to conduct an electronic surveillance. The affidavit, application and order were drafted in Newark. Then the documents were transmitted to three places—(i) the Deputy Chief in the Organized Crime and Racketeering Section in Washington who supervised the Newark office, (ii) Counsel's Office in the Federal Bureau of Investigation and (iii) the Title III Review Unit at the Department of Justice in Washington. It required four to eight work days to obtain the necessary approval for each surveillance order and for each extension.

Stewart also testified about his understanding of the sealing requirements under the statute. He stated that in 1981 he believed that tapes had to be sealed at the end of the surveillance process, that is, at the end of the interception being conducted at any particular premises. He testified that because of the complexity of the approval process there were often gaps between the expiration of a surveillance order and the date of an extension order.

Stewart knew of no law on the effect of these gaps, but he operated on the belief that if a gap were excessively long, it would be necessary to treat the extension as a new surveillance which would require sealing of the tapes obtained under the preceding order. He viewed 30 days as the outer limit of a gap, selecting 30 days because Title III speaks in terms of 30–day increments for the running of an order. He viewed 10 days as a reasonable period for a gap, and after that would "start to get nervous" (Tr. at 39).

Stewart testified about his interpretation of the statute's requirement that the tapes be sealed "immediately" upon the expiration of the surveillance order or extension thereof. In his words:

"A. It had to be done as quickly as possible, but within a matter of days.

\* \* \* \* \* \*

"A. ... In my experience Courts have had to interpret what satisfies a statutory mandate that something be done either immediately, promptly or forthwith. Those terms in my mind as of this point in time were interchangeable.

"In the context of the Fourth Amendment law, they have a meaning that it should be done as quickly as possible, certainly in a matter of some days.

\* \* \* \* \* \*

"A. ... I would like it to be done within a matter of three, four days.

"Again, if you're looking for a rule of thumb, the rule of thumb that I would have had at that time [1981–82] would be that I would get very nervous if ten days went by without it being done."

Tr. at 41.

Stewart testified that his ten day rule of thumb standard was derived from his previous experience with executing search warrants and making a return where Fed. R.Crim.P. 41 prescribes a ten-day period. He had, during the course of his work with the Department of Justice, assembled cases on electronic surveillance, some of which dealt with length of delays in sealing tapes. These cases had excused delays of six days, fourteen days and much longer periods.

Warren S. Robins took over from Stewart direct responsibility for the electronic surveillance activities in the DiGilio Group investigation, and by February or March 1982 he was handling by himself the day-to-day operation of preparing applications, filing five-day reports and attending to the sealing of the tapes. This was Robins' first work on a wiretap investigation by himself. He had discussions with Stewart about various aspects of electronic surveillance procedures.

As will be described in more detail below, in December 1981 he and Stewart conferred about the wiretap of the Zax apartment at a time when there was a question whether the wiretap should be extended or whether a new application would have to be made. During the conversation Robins misunderstood Stewart's advice about the time when sealing was required. Stewart intended to convey his understanding that sealing was required at the conclusion of surveillance operations at any particular premises. Robins understood him to mean that sealing was required at the end of the entire investigation in connection with which electronic surveillance was being considered. In Robins' words:

"With respect to this sealing, the discussion was that we had an obligation to seal the tapes at the end of the interception process which I took to mean the investigation, and that we would seal them promptly after the investigation process, and it would mean—at least it meant to me that we would do it within a reasonable time.

"If you didn't do it within a reasonable time, which my understanding was we were talking about something like ten days or so, then you had to have a reason why you were not doing it within that time."

Tr. at 158.

Thus, both Stewart and Robins were operating on a belief that sealing within a matter of days and no longer than ten days constituted compliance with the statutory sealing "immediately" requirement. They operated on different beliefs about what event triggered the sealing requirement. Stewart was of the belief that sealing was required at the end of the electronic surveillance of each particular premises. Robins, misunderstanding Stewart's instructions in this regard, was of the belief that sealing was not required until the end of electronic surveillance of all the premises involved in the investigation. As will be described below, Stewart's view determined the time of sealing through December, 1981 and Robins' views determined the time of sealing thereafter.

I note at this time Gallagher's and Carson's views about the sealing requirements. They differ from both Stewart's and Robins' views. It is these defendants' position that once a surveillance order expires the obligation to seal arises forthwith and, applying this statute literally, the tapes must be sealed on the expiration date. According to defendants there can be no gap between the expiration of an order and its renewal; if there is a gap the renewal is in fact a new surveillance order, and all the tapes obtained under the prior order must be sealed immediately.

With these conflicting views in mind, attention will be directed to the electronic surveillance which are at issue here.

## 2. The Zax Apartment

Stewart prepared the application and affidavit for an order authorizing the original electronic surveillance of the Zax apartment. Judge Frederick B. Lacey signed the order on October 1, 1981. It was due to expire on Saturday, October 31.

Stewart had prepared papers for an extension, but the Department of Justice did not complete its review and transmit its approval in sufficient time so that Stewart could present the application to Judge Lacey by Friday, October 30. Judge Lacey did not sign the extension order until November 3, the day Stewart received the necessary papers from the Department of Justice. Thus, there was a two day gap—November 1, which was a Sunday, and November 2. Wire tapping was shut down during any period when an order was not in effect.

The extension order was due to expire on Wednesday, December 3. Stewart had prepared papers for a second extension. A delay of 18 days, until December 21, occurred before Judge Lacey signed the second extension order. Stewart and Robins testified about the reasons for the delay, and the reasons are reflected in a December 9, 1981 report which was submitted to Judge Lacey.

The Department of Justice had advised Stewart on the December 3 expiration date that it was expected that authorization

would be forthcoming and transmitted to Stewart on December 4. However, necessary papers sent to the Department of Justice by express mail did not reach their destination until December 7, and the Department of Justice review was not completed until December 8.

Meanwhile, FBI Agents received information that the subject of the surveillance, John DiGilio, planned to enter a hospital on Wednesday, December 9, in order to undergo tests. It was not known how long he would remain there. There was no point in continuing to conduct this electronic surveillance if he were not in the Zax apartment. Therefore, Stewart decided to await events before submitting the application for a second extension to Judge Lacey.

After eleven days had elapsed Stewart became concerned that the gap between the first and second extension might become so long that the extension would be deemed a new application and the tapes would have to be sealed. Therefore, on December 14 he directed the FBI to assemble all the tapes, some of which had been sent to Washington for enhancement. This was accomplished by December 16, and on Friday, December 18, Stewart arranged for the sealing of the 205 tapes which had been obtained from electronic surveillance of the Zax apartment.

However, by December 21, DiGilio had returned to the Zax apartment, and under Stewart's view of the law it was not too late to obtain a second extension. Judge Lacey signed the extension on that date.

It was Stewart's view that the sealing on December 18 was purely precautionary in the event that DiGilio's absence from the apartment continued for such a long period that an extension would be deemed a new application. It was also Stewart's view that because of DiGilio's return to the apartment and the resumption of electronic surveillance well within 30 days of the expiration of the prior extension, it would not have been necessary to seal the tapes until

after the expiration of the final extension on February 27, 1982.

After the second extension Robins took over responsibility for electronic surveillance of the Zax apartment. The second extension expired on January 20, a Wednesday. Judge Lacey was out of town that week but left instructions that he wished to continue to monitor the electronic surveillance because of its complexity and his familiarity with the matter. In addition, there again were delays in processing the papers in Washington. Although Judge Lacey returned on Monday, January 25, the necessary papers were not received from the Department of Justice until January 27. They were presented to Judge Lacey on January 28, and he signed the third and last extension on that day.

The final extension order for the Zax apartment expired on February 27, 1982. It will be recalled that 205 tapes had already been sealed on December 18, 1981. On March 9, 1982, 33 tapes were sealed and on April 2, 1982, 108 tapes were sealed. Robins was in charge of sealing tapes in March and April, 1982.

There had been gaps of 2 days, 18 days, and 7 days between the successive surveillance orders relating to the Zax apartment. Neither Stewart nor Robins believed that the gaps were of any significance. It was their belief that there had been a series of three extensions of the original Zax electronic surveillance order. It was Stewart's belief that the obligation to seal arose upon the termination of the last such extension, namely on February 27, 1982. It was Robins' belief, however, that since electronic surveillance orders for other premises were in effect on February 27, it was not required under the statute to seal the Zax apartment tapes until the final electronic surveillance order expired. Robins, not Stewart, was handling the matter at that time.

Robins did in fact arrange for the sealing of the Zax apartment tapes before the expiration of the other electronic surveillance orders.[1] He did this, not because he be-

---

1. In addition to electronic surveillance of the Gallagher home, there was electronic surveillance of the telephone of John DiGilio's wife commencing in March, 1982. No tapes result-

lieved it was necessary but for housekeeping reasons. The investigation was complex and was generating a large number of tapes. On March 9, 1982, 33 Zax tapes which were not needed for enhancement purposes were sealed, and on April 2 the balance of the Zax tapes had been returned after enhancement and were sealed.[2]

### 3. *The Gallagher Home*

On January 28, 1982 an order was signed authorizing electronic surveillance of the Gallagher home. The order expired on Saturday, February 27, and an extension order was not signed until Tuesday, March 2. The reason for the delay was the failure of the Justice Department in Washington to sign off on the application until March 2.

The first extension of the Gallagher home electronic surveillance expired on April 1. The order authorizing the second extension was not signed until April 12. Justice Department authorization had not been received until Friday, April 9, and the application and order were presented to Judge Lacey the following Monday, April 12.

The April 12 extension order expired on Wednesday, May 12, 1982. All the tapes resulting from the Gallagher home electronic surveillance were sealed on Monday, May 17. This delay was in accordance with Robins' understanding of the sealing requirements, that "immediately" was equated with "promptly" and was complied with if sealing were accomplished within a short period of time of termination. This understanding was reflected in the language of the Judge's order authorizing the surveillance. The order stated:

"Upon termination of the interception process the special agent of the Federal Bureau of Investigation who is supervising the investigation shall promptly return to this court the original tape recordings obtained during the interception process for sealing." (Underscoring added).

Robins arranged for sealing the Gallagher home tapes at the conclusion of the second extension because no further extensions were being sought, no other premises were then the subject of electronic surveillance, and he believed that the interception process had been completed. This was in accordance with his understanding that the sealing requirement of the statute became operative upon the termination of the last of an investigation's electronic surveillance projects.[3]

Based upon the fruits of all of the electronic surveillance efforts and upon other data, a very comprehensive affidavit in support of numerous search warrants was prepared. Employing more than 100 law enforcement officers these search warrants were executed on May 24, 1982.

### 4. *The Bronson Office*

In November, 1982 electronic surveillance was resumed very briefly. On November 16 an order was signed authorizing surveillance of the office of Larry Bronson, Esq. The order expired on Thursday, December 16. Towards the end of the 30–day period the government attorneys were undecided whether to seek an extension of the order. They had intercepted conversations which they considered to be significant, but the precautions they had to take while intercepting conversations in an attorney's office presented serious problems. The decision was made not to proceed, but the uncertainty which had prevailed, the fact that there was a weekend immediately after interception ceased, and the necessity of attending to administrative matters to

---

ing from that surveillance were introduced into evidence at the trial.

**2.** The tapes obtained from the Zax apartment presented severe audibility problems and many required enhancement on special FBI equipment in Washington, D.C. To guard against possible interception, John DiGilio kept a police scanner going in the apartment; he kept a radio playing; his manner of speech was peculiar even under normal circumstances; and in the apartment he often appeared to talk in coded language.

**3.** The electronic surveillance of John DiGilio's wife's phone had terminated before May 12, 1982. Also another electronic surveillance—of an ILA office—had terminated.

prepare the tapes for sealing [4] resulted in their not being presented to Judge Lacey for sealing until Wednesday, December 22. Robins, as has previously been recited, believed that the delay did not constitute a violation of the statute's sealing requirements.

### 5. Related Events

Both Stewart and Robins testified that Judge Lacey reviewed the entire interception operation with meticulous care, reading each application and five-day report in the presence of the government attorney and where he saw problems cautioning them.

On one occasion, when he was out of town for a period of time, Judge Lacey referred the government attorney to another judge, but on all other occasions, having developed familiarity with a complex matter, he himself handled the applications for initial orders, extensions, reports and sealings. On occasion this was the cause for a delay in obtaining an extension or sealing because Judge Lacey, being unavailable, asked the government attorney to await his return.

The government's attorneys concluded that it was necessary to unseal the tapes in order that they could be enhanced. This took place with respect to Zax apartment tapes and some Bronson office tapes.

The government attorneys were of the opinion that unsealing was not governed by statutory requirements and that their obligation was to obtain court authorization and to ensure the integrity of the released tapes. Judge Lacey received these applications and signed the unsealing orders.

In October 1983 Judge Lacey authorized the unsealing of the Zax tapes and some of the Bronson tapes. Serious audibility problems were being encountered and the government wished to send them to an expert, Paul Ginsberg, to obtain better duplicates. Robins testified about the security which was maintained with respect to the tapes which were removed from the

Clerk's Office pursuant to the unsealing order and held in the United States Attorneys' Office until December, 1984 when they were resealed. The security was comprehensive and effective.

During the same period in the course of a criminal proceeding in Trenton, Judge Thompson authorized unsealing copies of the tapes for the use of the defense attorneys. By mistake Robins unsealed the originals as well as the copies. The originals were used as exhibits at the trial, but they were retained in FBI custody during their use in the Trenton proceeding and were returned undamaged and unaltered. Robins was of the opinion that it would have been proper for Judge Thompson to have authorized the unsealing of the original tapes for use at trial rather than the copies.

The details of the sealing of each of the 22 tapes admitted into evidence in the present case are set forth in Appendix C of this opinion.

### D. CONCLUSIONS CONCERNING SEALING OF THE TAPES

There were five sealing events which are pertinent to this case. Each raises legal questions.

The December 18, 1981 sealing of 205 tapes taken during interception of the Zax apartment raises two questions: (i) Did the time gap between orders authorizing and extending electronic surveillance of the Zax apartment prevent successive orders from being extensions of the original order within the meaning of 18 U.S.C. § 2518(8)(a)? (ii) If the answer is "yes," but the government attorneys mistakenly believed that such a gap did not prevent successive orders from being extensions of the original and successive orders, was such mistaken belief a satisfactory explanation of the resulting sealing delay?

The March 9 and April 2, 1982 sealings of the balance of the tapes taken in the Zax apartment raise the two questions set forth

---

**4.** According to Robins' testimony these administrative matters included completing the FBI's chain of custody procedures, sending the tapes through their evidence room, and inventorying them.

above and also raise two additional questions: (i) If the sealing requirements commenced on February 27, 1982 when the last Zax apartment order expired, did the March 9 and April 2 sealings constitute immediate sealing within the meaning of 18 U.S.C. § 2518(8)(a)? (ii) If the answer is "no," did Robins' belief that the sealing requirement with respect to the Zax apartment tapes did not arise until the electronic surveillance investigation as a whole was completed constitute a satisfactory explanation of the resulting sealing delay?

The May 17, 1982 sealing of the tapes taken during interception of the Gallagher home raises the two questions arising from gaps between orders authorizing and extending electronic surveillance. It raises two additional questions: (i) If the sealing requirement commenced on May 12, 1982 when the last Gallagher home order expired, did the May 17, 1982 sealing constitute immediate sealing within the meaning of 18 U.S.C. § 2518(8)(a)? (ii) If the answer is "no," did the government offer a satisfactory explanation for the delay?

The December 16, 1982 sealing of the tapes taken during interception of the Bronson office raises two questions: (i) Did the December 22, 1982 sealing constitute immediate sealing within the meaning of 18 U.S.C. § 2518(8)(a)? (ii) If the answer is "no," did the government offer a satisfactory explanation for the delay?

The answers to all of these questions is to be found in § 2518(8)(a) and in the two most recent sealing case opinions binding in this circuit—*United States v. Rios*, —— U.S. ——, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990) and *United States v. Vastola*, 915 F.2d 865 (3d Cir.1990).

In pertinent part § 2518(8)(a) provides with respect to recordings of intercepted electronic communications that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." In addition the statute provides that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof,

shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom...."

Interpreting these provisions in *Rios* the Supreme Court observed that the seal required by § 2518(8)(a) is "a seal that has been obtained *immediately* upon expiration of the underlying surveillance order." 110 S.Ct. at 1849. The Court did not further define "immediately."

■ The absence of a seal which must be explained satisfactorily by the government "encompasses not only the total absence of a seal but also the absence of a timely applied seal." Id at 1849. Further, the Court ruled that "the 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the government explain not only why a delay occurred but also why it is excusable," id at 1850, and that "[i]n establishing a reasonable excuse for a sealing delay, the government is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was objectively reasonable at the time." Id at 1851.

I shall attempt to apply the statute, *Rios* and *Vastola* to each of the sealing events in this case.

■ The December 18, 1981 sealing of 205 tapes of recorded communications at the Zax apartment came in the midst of the electronic surveillance of that apartment. The original surveillance order was signed on October 1 and expired on October 31. There was a two day hiatus and then an extension order was signed on November 3, expiring on December 3. Then there occurred the 17 day hiatus caused by the DiGilio hospitalization, and the next extension was signed on December 21, expiring on January 20, 1982. There was a seven day hiatus and then the January 28 extension order was signed. It expired on February 27, 1982.

The first issue which this sequence of events poses is whether, as the government contends, this is a single electronic surveillance giving rise to an obligation to seal immediately after the February 27 expira-

tion of the third extension or whether, as Gallagher and Carson contend, because of the gaps in the electronic surveillance authorizations the original order and each extension is a separate surveillance triggering a sealing requirement at the end of each.

If the government's contention is correct the sealing of 205 tapes on December 18, 1981 was accomplished long before the date when sealing was required. If Gallagher and Carson are correct, the sealing requirement arose on October 31, the termination date of the original order and the sealing would have taken place 48 days thereafter. This would not have been an "immediate" sealing and thus the government would be required to satisfactorily explain the delay.

Neither *Rios* nor *Vastola* rule specifically upon the effect of a gap.

At least one of the facilities at issue in *Rios* involved electronic surveillance in which a gap between orders of authorization occurred. On January 18, 1985 an order was signed authorizing electronic surveillance of two public telephones. The order expired on February 17. Because of difficulties in finishing the affidavit necessary to obtain an extension, the government did not obtain an extension order until March 1, 1985. The order was thereafter extended twice (presumably without any gaps) and finally expired on May 30. Sealing was effected on June 15.

The district court in *Rios* held that the March 1 order could not be considered an extension of the initial order because of the 12 day delay and the government's failure to satisfactorily explain that delay. The Second Circuit affirmed.

The Supreme Court did not decide when the obligation to seal in fact arose. It did not address the gap question insofar as it related to electronic surveillance of a single premises. Rather its attention was directed primarily to the government's more expansive explanation for all the sealing delays, namely, that its supervising attorney believed that he was not required to seek sealing of the tapes until there was a meaningful hiatus *in the investigation as a whole.*

*Vastola,* on the other hand, gives some support to the government's position. In *Vastola* it would appear that there was in fact a short gap between the order authorizing one of the electronic surveillance operations, at issue, and the first extension. The original order was signed on March 15, 1985. It must have expired on April 14. The first extension was not authorized until April 16. Thus there was a two day gap. When computing the time when the sealing requirement began the Third Circuit disregarded this gap and held that the pertinent date was either on June 13 when the third and final extension expired or on May 31 when interception actually ceased. In a footnote addressing a different issue the Third Circuit noted "an interruption could be viewed at the time only as a hiatus." fn. 16 at 915 F.2d 875.

 I conclude that were the issue presented to them, both the Supreme Court and the Third Circuit would conclude that, when caused by administration difficulties, a brief hiatus between the expiration of an order and an extension will not prevent the extension from being deemed an "extension" within the meaning of § 2518(8)(a). Thus the obligation to seal would not arise until the termination of the final extension.

Applying that conclusion in the present case, in spite of the gaps between the orders for electronic surveillance of the Zax apartment, sealing obligations did not arise until February 27 when the third extension order expired. Two of the gaps were relatively brief and were caused by difficulties in processing approval of an extension application by the Department of Justice. The longer gap from December 4 to 20 was occasioned by John DiGilio's hospitalization and the resulting uncertainty whether the Zax apartment surveillance would be continued.

The sealing of 205 tapes on December 18, 1981 was, therefore, long before the sealing obligation arose. No explanation for a delay is required because there was no delay.

If I am wrong in this respect, then it is abundantly clear that Stewart's belief in 1981 and 1982 that a gap did not prevent a renewal order from constituting a statutory extension was a satisfactory explanation for a sealing delay. Applying *Rios*, his interpretation was objectively reasonable at the time and, for that matter, is still objectively reasonable. Thus there are two reasons to conclude that there are no grounds to suppress the 205 tapes sealed on December 18—(i) there was no sealing delay and (ii) if there was a delay, the government has provided a satisfactory explanation.

Different problems present themselves with respect to the 33 tapes sealed on March 9, 1982 and the 108 tapes sealed on April 2, 1982. These sealings occurred 10 and 33 days, respectively, after the expiration on February 27, 1982 of the third and final extension of electronic surveillance of the Zax apartment. I shall assume, certainly correctly with respect to the 33 day delay, that these sealings did not occur immediately upon termination of the third extension order within the meaning of § 2518(8)(a). Thus unless the government has given a satisfactory explanation, their suppression would be required.

The government has offered an explanation. Beginning in late 1981 Robins assumed complete charge of the electronic surveillance operations. Unlike Stewart, he was of the opinion that the obligation to seal did not arise until the entire electronic surveillance phase of the investigation came to an end. In February 1982 the electronic surveillance of the Zax apartment terminated, but electronic surveillance of the Gallagher home, which had commenced on January 28 of that year, was still in progress, and electronic surveillance of Mildred DiGilio's telephone was about to begin.

Robins arranged for the March 9 and April 2 sealing of the Zax apartment tapes not because he believed that there was an obligation to do so but for housekeeping reasons. Enhancement had been completed and the tapes were simply taking up space in a secured evidence area.

The electronic surveillance operations appeared to have come to an end on May 12, 1982, when the second and final extension of the Gallagher home electronic surveillance terminated. It was Robins' belief that May 12 was the date when the sealing obligation arose not only with respect to the Gallagher home tapes but also with respect to the Zax apartment tapes which had, in fact, been sealed in March and April.

*Rios* suggests, but does not hold, that Robins was wrong in his belief that the sealing obligation commenced at the end of the entire electronic surveillance process. *Vastola*, however, unambiguously holds that his view was erroneous.

> Although the government rightly points out that *Rios* did not decide whether a change in the location of an illegal operation will prevent a subsequent order covering new location from being an extension of a previous order, the statute unambiguously rules out this possibility.

At 874, 875.

*Rios* states what inquiry must be made in these circumstances: "In establishing a reasonable excuse for a sealing delay, the Government is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was objectively reasonable at the time." 110 S.Ct. at 1851.

Gallagher and Carson urge that Robins' view could not be found to have been objectively reasonable at the time in question under all the circumstances which prevailed then. His superior, Stewart, did not share his view, although Robins mistakenly believed that he did.

A multi-volume publication entitled United States Attorneys' Manual prepared by the Department of Justice provided guidance to United States Attorneys' Offices throughout the country with respect to performance of their myriad tasks. One lengthy and detailed section was devoted to all phases of electronic surveillance. Section 9–7.340 provided in part that

*[i]mmediately* upon termination of the interception, the original recordings of the conversation should be submitted by the supervising attorney to the judge authorizing the interception [for sealing].

Gallagher and Carson emphasize that this Section of the Manual requires submission to the judge for sealing immediately upon the termination of the *"interception,"* not upon termination of the "investigation."

I do not find that this language in the Manual renders Robins' opinion unreasonable.

Robins was conducting the electronic surveillance operations under continuing review and authorization by the Justice Department officials in charge of such operations. Except for one occasion, Judge Lacey reviewed all applications and reports and signed the sealing orders. He was a former United States Attorney and, as he was required to do under the law, he examined with great care each application and report presented to him.

One of the interception activities with which *Rios* dealt involved a sequence of events which was very similar to the sequence of events with which we are now dealing. In *Rios* the orders authorizing electronic surveillance at one location terminated on July 23, 1984. Electronic surveillance was undertaken at a new location, and the orders authorizing the second surveillance terminated on October 10, 1984. The tapes resulting from both surveillance were sealed on October 13, 1984. The explanation which the government attorney in charge offered for the delay in sealing the tapes resulting from the first electronic surveillance operation was that he "believed that he was not required to seek sealing of the tapes until there was a meaningful hiatus in the investigation as a whole." 110 S.Ct. at 1850. This is essentially the same as Robins' explanation.

The Supreme Court noted two Second Circuit cases which, while not establishing that the supervising attorney's view was correct, did "support the conclusion that the 'extension' theory now pressed upon us was objectively reasonable at the time of the delays." Id at 1851. The cases to which the Supreme Court referred were *United States v. Principie,* 531 F.2d 1132 (2d Cir.1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977) and *United States v. Scafidi,* 564 F.2d 633 (2d Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978).

The Second Circuit and the Third Circuit are in close geographical proximity and in view of the fact that each of these Circuits includes a part of the greater New York City area their law enforcement efforts often overlap and require continuing cooperation. It will be noted that Stewart had been transferred from New York before he commenced working on the John DiGilio investigation in New Jersey. Second Circuit opinions in the field of criminal law, as well as in a number of other fields, have a significant influence where there is no Third Circuit authority. Thus the existence of the *Principie* and *Scafidi* opinions have a similar effect in this case as they had in *Rios.*

In *Rios* the Supreme Court held that in light of those cases the supervising attorney's view of the sealing requirement was objectively reasonable and that if in fact that was the government's excuse at the suppression hearing the district court was in error when it held that the government had not given a satisfactory explanation for the 82–day delay in sealing the tapes resulting from electronic surveillance at the original location. By the same token I conclude that Robins' view, though wrong, was objectively reasonable and that, therefore, the government has provided a satisfactory explanation for the delay in sealing the 33 tapes on March 9, 1982 and for the delay in sealing the 108 tapes on April 2, 1982.

 It is possible to discuss together the May 17, 1982 sealing of the tapes from the Gallagher home surveillance and the December 22, 1982 sealing of the tapes from the Bronson office surveillance. The Gallagher home surveillance raises the gap problem, but I have already concluded that a short interval between electronic surveillance orders and extension orders relating to the same premises does not prevent sub-

sequent orders from constituting extension orders under § 2518(8)(a). Thus the sealing requirement with respect to the Gallagher home electronic surveillance arose on May 12, 1982, when the second and final extension order terminated.

There was only one order applicable to the Bronson office and that terminated on December 16, 1982.

The Gallagher home tapes were sealed on May 17—a 5 day delay. The Bronson office tapes were sealed on December 22—a 6 day delay. In each case a weekend intervened between the termination of the electronic surveillance order and the date of sealing.

Gallagher and Carson urge that this does not comply with the statute's requirement that sealing be effected "immediately" upon the expiration of the period of the order and that the government has offered no satisfactory explanation for the delay.

Neither *Rios* nor *Vastola* addressed the "immediately" issue as posed here. Gallagher and Carson argue that the statute requires that sealing be done forthwith, with absolutely no delay, that is on the very day of termination or no later than the next day. Both Stewart and Robins testified that it had been their view that the statute required sealing to be effected promptly within a matter of days, no longer than 10 days.

It is quite apparent that the Third Circuit does not define "immediately" as strictly as Gallagher and Carson define it. In *Vastola* the court construed sealing immediately in the statutory sense as sealing "as soon as practical" after termination.

> We conclude that a sealing delay indeed occurred as the West Long Branch tapes should have been sealed either as soon as was practical after May 31, 1985, when the actual surveillance ended, or as soon as practical after June 13, 1985, when the final extension order expired.

915 F.2d at 875.

In the present case it would appear that the Gallagher home tapes and the Bronson office tapes were sealed as soon as practical after the applicable expiration dates.

The 5 and 6 day delays each included a weekend. While it may not have been mandatory to have Judge Lacey sign the sealing orders, he had been closely following the entire electronic surveillance operation and it was reasonable to attempt to reach him for this purpose even if that involved a short delay.

If the 5 and 6 day sealing delays failed to comply with the "immediately" requirements of § 2518(8)(a), the government has given a satisfactory explanation for the delays. Stewart's and Robins' belief about the statutory requirement was objectively reasonable. The short delays were not intended to achieve any tactical advantage; they prejudiced no one; it was established at hearings prior to the trial that the tapes have in no way been altered or otherwise impaired. There is, therefore, no basis to suppress the tapes sealed on May 17 and December 22, 1982.

### E. UNSEALING THE TAPES

Gallagher and Carson also seek suppression of the tapes because most of them, after initial sealing, were unsealed for enhancement and, in some cases, for use at another trial.

At a hearing held prior to the trial in this case I found that the government had established the authenticity and integrity of the tapes. The evidence at the trial confirmed that conclusion. From this it followed that the fact that the tapes had been unsealed and enhancement procedures employed did not require their suppression.

Gallagher and Carson argue that *Rios* requires a different result. The Third Circuit's decision in *Vastola* compels rejection of this argument. The Court held that § 2518(8)(a)'s remedies do not extend to post-unsealing situations and that "we would be hard pressed to find that Congress required anything more than proof of authenticity where the custody requirements of unsealing orders technically have been violated." 915 F.2d at 873.

### F. MOTION FOR BAIL

Prior to the hearing in this matter I denied a motion of Gallagher to be re-

leased on bail pending final resolution of the questions raised on this remand. Carson filed a similar motion and I deferred a ruling on it until after the hearing. After the hearing Gallagher renewed his motion to be released on bail.

Both motions will be denied. I conclude on the basis of the facts developed at the recent hearing and on the basis of my review of the law that an appeal from my decision will not raise a substantial question of law or fact likely to result in a reversal or an order for a new trial. 18 U.S.C. § 3143(b).

I request the government to submit an order in conformity with this opinion.

## APPENDIX A

| | Zax Orders | Zax Sealing | Gallagher Home Phone Orders | Gallagher Home Phone Sealing | Bronson Law Office Orders | Bronson Office Sealing |
|---|---|---|---|---|---|---|
| **1981** | | | | | | |
| October | Oct 1 (Order) ↓ Oct 31 | | | | | |
| November | [Gap Nov 1-2] Nov 3 (1st Ext) ↓ | | | | | |
| December | Dec 3 [Gap Dec 4-20] Dec 21 (2nd Ext) ↓ | Dec 18 - Sealed (205 Tapes) | | | | |
| **1982** | | | | | | |
| January | Jan 20th [Gap Jan 21-27] Jan 28th (3rd Ext) | | Jan 28 (Order) ↓ | | | |
| February | February 27th | | Feb 27 [Gap Feb 28 - March 1 (2 days)] March 2 (1st Ext) ↓ | | | |
| March | | March 9 - Sealed (33 Tapes) | | | | |
| April | | April 2 (108 Tapes) | April 1 [Gap 4/2 - 4/11] April 12 (2nd Ext) ↓ | | | |
| May | | | ↓ May 12, 1982 | May 17 - Sealed All Tapes | | |
| May 24, 1982 | Search Warrants Executed | | | | | |
| June | | | | | | |
| July | | | | | | |
| August | | | | | | |
| September | | | | | | |
| October | | | | | | |
| November | | | | | Nov 16, 1982 (Order) ↓ | |
| December | | | | | Dec 16, 1982 | Dec 22, 1982 Sealed (All Tapes) |

APPENDIX B

| NUMBER | DATE ORDER EXPIRED | DATE SEALED | DELAY (GOV'T) | DELAY (DEF'T) |
|--------|------------|------------|---------------|---------------|
| 100 AA | Oct. 31 | Dec. 18 | -71 | 48 |
| 101 AA | Oct. 31 | Dec. 18 | -71 | 48 |
| 102 AA | Oct. 31 | Dec. 18 | -71 | 48 |
| 103 AA | Oct. 31 | Dec. 18 | -71 | 48 |
| 104 AA | Oct. 31 | Dec. 18 | -71 | 48 |
| 105 AA | Dec. 3 | Dec. 18 | -71 | 15 |
| 201 D | Dec. 3 | Dec. 18 | -71 | 15 |
| 107 AA | Jan. 20 | Apr. 2 | 33 | 72 |
| 107 BB | Jan. 20 | Mar. 9 | 10 | 46 |
| 108 AA | Jan. 20 | Apr. 2 | 33 | 72 |
| 109 AA | Jan. 20 | Apr. 2 | 33 | 72 |
| 109 BB | Jan. 20 | Apr. 2 | 33 | 72 |
| 113 AA | Jan. 20 | Apr. 2 | 33 | 72 |
| 203 F | Jan. 20 | Apr. 2 | 33 | 72 |
| 203 G | Jan. 20 | Apr. 2 | 33 | 72 |
| 114 AA | Feb. 27 | Apr. 2 | 33 | 33 |
| 115 AA | Feb. 27 | Apr. 2 | 33 | 33 |
| 116 AA | Feb. 27 | May 17 | 5 | 79 |
| 128 CC | Apr. 1 | May 17 | 5 | 47 |
| 202 D | Dec. 16 | Dec. 22 | 6 | 6 |
| 140 AA | Dec. 16 | Dec. 22 | 6 | 6 |
| 141 AA | Dec. 16 | Dec. 22 | 6 | 6 |

## APPENDIX C

### THE UNSEALING OF THE TAPES AT ISSUE IN THE CASE

A. *Tapes 100AA–104AA:* These tapes were recorded between October 1, and October 31, 1981 pursuant to the October 1, 1981 order authorizing electronic surveillance of the Zax apartment. They were sealed pursuant to the December 18, 1981 sealing order. It will be recalled that the government arranged for that sealing because of the uncertainty about the date DiGilio would return from the hospital.

According to Gallagher and Carson there was a 48 day sealing delay. There had been a two day gap between the October 31 expiration of the original surveillance order and the November 3 extension. According to Gallagher and Carson this required that sealing be effected on October 31, not December 3 when the November 3 extension expired. According to the government, applying Stewart's analysis, it was unnecessary to seal on October 31 since, in view of DiGilio's prompt return, the surveillance of the premises was a continuing one and in fact continued until February 27, 1982. In accordance with that theory these tapes were sealed 71 days before it was necessary to do so under the statute.

B. *Tapes 105AA and 201DD:* These tapes were recorded between November 3 and December 3, 1981 pursuant to the November 3 order extending surveillance of the Zax apartment. They, too, were sealed pursuant to the December 18, 1981 sealing order.

According to Gallagher and Carson there was a 15 day sealing delay. The 17 day gap between the December 3 expiration of the first extension order and the December 21 second extension made it necessary to seal on December 3 when the November 3 extension order expired. Again applying Stewart's analysis the government asserts it was unnecessary to seal these tapes on December 18, 1981 and that in fact they too were sealed 71 days before it was necessary to do so under the statute.

C. *Tapes 107AA, 108AA, 109AA, 109BB, 113AA, 203F, 203G:* These tapes were recorded between December 21, 1981 and January 20, 1982 pursuant to the December 21, 1981 order extending the surveillance of the Zax apartment. They were sealed pursuant to the April 2, 1982 sealing order.

According to Gallagher and Carson there was a 72 day sealing delay. There had been a 7 day gap between the January 20, 1982 expiration of the second extension order and the January 28, 1982 third extension. According to Gallagher and Carson this required that sealing be effected on January 20, not February 27 when the January 28 extension expired.

According to the government, applying Stewart's theory, it was unnecessary to seal the tapes upon the January 20, 1982 expiration of the second extension order, and sealing obligations did not arise until February 27, which was the termination date of the third and final Zax apartment extension. Under that interpretation the sealing on April 2 was 33 days after the statutory sealing obligation arose.

However, Robins was in charge of the electronic surveillance at that time and it was his belief that the sealing requirement did not become effective until the entire electronic surveillance operation ended. That would have been May 12, 1982 when the second extension order for the Gallagher home terminated (On May 12 the late 1982 electronic surveillance of the Bronson office was not contemplated, and thus in May the government attorneys, believing that the electronic surveillance phase had ended, had no reason to postpone sealing the tapes even under Robins' theory). Under Robins' theory the obligation to seal the Zax apartment tapes arose on May 12 and thus the April 2 sealing was, in fact, at least 40 days early.

D. *Tape 107BB:* The status of this tape is exactly the same as that of the tapes discussed in "C" above except that it was sealed on March 9 rather than April 2. In that situation Gallagher and Carson assert that there was a 46 day sealing delay. Under Stewart's theory the sealing on March 9 was 10 days after the statutory sealing obligation arose. Under Robins'

theory the March 9 sealing was at least 64 days early.

E. *Tapes 114AA and 115AA:* These tapes were recorded between January 28 and February 27, 1982 pursuant to the January 28 order extending surveillance of the Zax apartment. They were sealed pursuant to the April 2, 1982 sealing order.

According to Gallagher and Carson there was a 33 day sealing delay. Applying Stewart's theory, the government arrives at the same conclusion. It was necessary to seal the tapes upon the February 27 expiration of the third extension because that marked the end of electronic surveillance of the Zax apartment. Under that interpretation also the sealing on April 2 was 33 days after the statutory sealing obligation arose.

Again, however, it was Robins who was in charge of sealing and, as noted before, it was his belief that the sealing requirement did not arise until the entire electronic surveillance operation ended on May 12, 1982. Under that interpretation the April 2 sealing of these two tapes was at least 40 days early.

F. *Tapes 116AA:* This tape was recorded between January 28 and February 27, 1982 pursuant to the January 28, 1982 order authorizing electronic surveillance of the Gallagher home. It was sealed pursuant to a May 17, 1982 sealing order.

According to Gallagher and Carson there was a 79 day sealing delay. There had been a 2 day gap between the February 27 expiration of the original surveillance order and a March 2 extension. According to Gallagher and Carson this required that sealing be effected on February 27, not May 12 when the final Gallagher home extension expired.

According to the government, applying Stewart's interpretation of the statute, the obligation to seal did not arise until May 12, the date when the second and final extension order permitting electronic surveillance of the Gallagher home expired. Sealing was accomplished 5 days later—on May 17.

G. *Tape 128CC:* This tape was recorded between March 2 and April 1, 1982 pursuant to the March 2, 1982 order extending electronic surveillance of the Gallagher home. It was sealed pursuant to the May 17, 1982 sealing order.

According to Gallagher and Carson there was a 47 day sealing delay. There had been a 10 day gap between the April 1 expiration of the first extension order and an April 12 second extension. According to Gallagher and Carson this required that sealing be effected on April 1, not May 12 when the second and final Gallagher home extension order expired.

According to the government, applying Stewart's interpretation of the statute, the obligation to seal did not arise until May 12, the date when the second and final extension order expired. Sealing was accomplished 5 days thereafter.

H. *Tapes 202D, 140AA, 141AA:* These tapes were recorded between November 16 and December 16, 1982 pursuant to the November 16, 1982 order authorizing electronic surveillance of the Bronson office. They were sealed pursuant to a December 22, 1982 sealing order.

Since there were no extensions of this electronic surveillance order, both Gallagher and Carson and the government agree that six days elapsed between the date when the sealing requirement arose by virtue of the expiration of the electronic surveillance order and the date of the sealing. Gallagher and Carson contend that the sealing did not comply with the statute. In 1982 Stewart and Robins believed that the sealing did comply with the statute.