UNITED STATES of America, Appellee,

v.

Donald CARSON, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony GALLAGHER, Appellant.

Nos. 91–5019, 91–5030.

United States Court of Appeals,
Third Circuit.

Argued July 10, 1991.

Decided July 9, 1992.

Frederic J. Gross (argued), Mount Ephraim, N.J., for appellant Donald Carson.

Edward A. Hartnett (argued), Robinson, St. John & Wayne, Newark, N.J., for appellant Anthony Gallagher.

Michael Chertoff, U.S. Atty., Edna B. Axelrod (argued), Chief, Appeals Div., Office of U.S. Atty., Newark, N.J., for appellee.

PRESENT: STAPLETON, HUTCHINSON and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Donald Carson (Carson) and Anthony Gallagher (Gallagher) appeal from their racketeering and conspiracy convictions, arguing that various electronic surveillance audiotapes were erroneously admitted at trial. They contend that the tapes were not sealed immediately after the authorizing orders expired, as the statute authorizing electronic surveillance requires, and that the government offered no satisfactory explanation for the delay. Carson and Gallagher also say that certain tapes were improperly unsealed and that all evidence obtained as a result of the information on the improperly sealed or unsealed tapes should also have been excluded.

We hold that 108 of the tapes at issue should have been suppressed and another 33 should be suppressed if the district court finds on remand that the sealing was not "immediate" and that the government failed to offer an objectively reasonable and satisfactory explanation for the delay. We will therefore vacate the district court's judgment and remand for further proceedings in accordance with this opinion. On remand the district court will also need to determine whether the government unsealed any of the tapes for "tactical gain." If properly preserved by the parties below, the district court will also need to determine whether any of the suppressed tapes were relied upon by the grand jury in returning the indictment or were relied upon by the government to procure other evidence used by the government during trial and, if so, what impact, if any, the suppression of these tapes has on the indictment itself or on the evidence introduced at trial. Finally, on remand the district court should determine whether Carson and Gallagher are entitled to a new trial based on the improperly admitted tapes.

## I.

## BACKGROUND

On April 25, 1988, a jury found Carson and Gallagher guilty of violating section 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961–1968 (West 1984 & Supp. 1992), and conspiracy to extort money in violation of the Hobbs Act, 18 U.S.C.A. § 1951 (West 1984). *See United States v. Gallagher*, 751 F.Supp. 481, 483 (D.N.J. 1990). Carson and Gallagher had been indicted for criminal activity in connection with a stevedoring operation with six other defendants. Carson was sentenced to concurrent sentences of seven years and fined $10,000 on each count. Gallagher was sentenced to concurrent sentences of twelve years on each count which were to be served concurrently with a sentence for civil contempt.[1]

During its investigation, the government used wiretaps to record conversations at three different premises. Prior to trial, Carson and Gallagher moved to suppress this electronic surveillance evidence be-

---

**1.** The record does not indicate the action that constituted the contempt or the length of the sentence imposed.

cause, *inter alia,* the government failed to timely seal the tapes in accordance with the prophylactic sealing requirements of 18 U.S.C.A. § 2518(8)(a) (West Supp.1992), a section enacted by Congress, at least in part, to prevent tampering with electronic surveillance tapes and insure their reliability. In their motion to suppress, Carson and Gallagher alleged that the tapes showed evidence of tampering. On November 2, 1987, the district court denied the motion to suppress without considering the statute's prophylactic provisions because the evidence showed that the integrity of the tapes had not been compromised. In focusing directly on the absence of tampering, the district court relied on our decision in *United States v. Falcone,* 505 F.2d 478 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). In *Falcone,* we held that the failure to seal tapes in a timely manner under section 2518(8)(a) would not require suppression of the tapes so long as the government could prove that the integrity of the tapes had not been compromised. *See Falcone,* 505 F.2d at 484.

Both Carson and Gallagher appealed their convictions to this Court, contesting the use of the tapes as evidence against them at trial. While these direct appeals were pending, Carson and Gallagher also filed motions in the district court for new trials based on newly discovered evidence. The district court denied these motions, as well as a motion for reconsideration that followed. Carson and Gallagher appealed from these orders. We affirmed the district court's orders and Carson and Gallagher's convictions in an unpublished memorandum opinion. *See United States v. Carson,* 870 F.2d 652 (3d Cir.1989) (table).

Gallagher then filed a petition for a writ of *certiorari* in the Supreme Court of the United States. While Gallagher's petition for *certiorari* was pending, the Supreme Court issued its opinion in *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). In *Ojeda Rios,* the Supreme Court held that tapes which were not sealed in a timely fashion under section 2518(8)(a) must be suppressed unless the government offers a satisfactory, "objec-

tively reasonable" explanation for the belated sealing, regardless of the integrity of the tapes. *Id.* An explanation that the delay was due to the government's misconception of the law could be satisfactory if the misconception, though erroneous, was objectively reasonable and was relied on by the government as the explanation for the delay in the district court. *Id.*

*Ojeda Rios* effectively overruled *Falcone,* the decision on which the district court had relied in deciding not to suppress the electronic surveillance tapes. Following its decision in *Ojeda Rios,* the Supreme Court vacated our judgment affirming Gallagher's conviction and remanded his case for further consideration in light of *Ojeda Rios. See Gallagher v. United States,* 495 U.S. 926, 110 S.Ct. 2162, 109 L.Ed.2d 492 (1990) (mem.). Thereafter, we recalled our mandate in Carson's appeal and remanded both cases to the district court for reevaluation of the electronic surveillance suppression issues in light of *Ojeda Rios. See United States v. Carson,* 909 F.2d 1477 (3d Cir.1990) (table); *United States v. Gallagher,* 909 F.2d 1478 (3d Cir. 1990) (table).

On remand, the district court held an evidentiary hearing to examine the circumstances surrounding the sealing and unsealing of the tapes, and evidence was presented concerning the government's conceptions of its sealing obligations and the reasons for any sealing delays. In an opinion filed on November 26, 1990, the district court concluded that the government complied with the statute's sealing requirements as to the tapes at issue. *Gallagher,* 751 F.Supp. at 492–96. It determined that brief gaps occasioned by administrative problems between the expiration of an order and its extension did not result in an obligation to seal tapes upon the expiration of the original order; rather, the sealing obligation did not arise until the expiration of the final extension of the original order. *Id.* at 943. The district court also decided that even if the tapes were not immediately sealed, the government's explanations for the sealing delays were satisfactory. *Id.* at 494. Finally, the court

reiterated its determination that none of the tapes had to be suppressed because of accidental unsealing. *Id.* at 496.

Gallagher filed his notice of appeal from the district court's decision on December 6, 1990. Carson filed a formal notice of appeal on December 19, 1990.

## II.

## FACTS

This appeal focuses on procedural questions concerning the government's compliance with the sealing requirements set forth in 18 U.S.C.A. § 2518(8)(a). Thus, the facts that are central to the disposition of this case do not concern the underlying convictions but instead relate to the challenged electronic surveillances.

Several different locations were the subject of electronic surveillance by the United States Department of Justice's Organized Crime and Racketeering Strike Force in Newark, New Jersey (Strike Force). Three electronic surveillance orders (and their extensions) are the subject of this appeal: the order and extensions permitting the government to install listening devices in and wiretap both the home and office phones of John DiGilio (DiGilio), the supervisor of the criminal enterprise (DiGilio's office is referred to by the parties and in our opinion as "the Zax apartment" and this order is referred to as "the Zax order"); the order and extensions permitting electronic surveillance of Gallagher's home (the Gallagher order); and the order authorizing electronic surveillance of the law office of attorney Larry Bronson (Bronson) (the Bronson order).

Robert C. Stewart, Esquire (Stewart) was the attorney-in-charge of the Strike Force during the time this electronic surveillance took place. Stewart was an Assistant United States Attorney employed by the Department of Justice since 1971. He joined the Strike Force in New Jersey in 1978 and handled several wiretap investigations prior to this one. At the hearing, Stewart told the district court that he "had overall supervisory responsibility, prosecutorial responsibility for the conduct of the

investigation from its inception right straight through." Joint Appendix (Jt.App.) at 67. In addition, Stewart drafted the original application for the order authorizing electronic surveillance upon the Zax apartment as well as some of the orders extending the initial times for surveillance.

Warren S. Robins, Esquire (Robins) was a Special Attorney with the Organized Crime and Racketeering section of the Department of Justice and was assigned to the Newark Strike Force in 1977. Robins became involved in the investigation in late October or November of 1981 and by February or March of 1982 had taken over the day-to-day management of the investigation from Stewart. The DiGilio Group investigation was Robins' first wiretap investigation, and he met regularly with Stewart, his supervisor, to discuss the case. Robins worked on the investigation until he left for private practice in August of 1984. He directed all of the sealings except the December 18, 1981 sealing of 205 Zax tapes that were sealed by Stewart. Robins estimated that he spent at least ninety-percent of his time on the DiGilio investigation while he was assigned to it.

According to Stewart, the Strike Force has to follow certain internal administrative procedures before applying for wiretap orders and extensions with the court. Before applying for an order, the Strike Force prepares an affidavit, an order, and an application for the order. These drafts are then sent to a deputy chief in the Organized Crime and Racketeering section of the Department of Justice, the counsel's office of the Federal Bureau of Investigation (FBI) and the Title III review unit in the Department of Justice. The Title III unit conducts a final review of the documents and makes a recommendation to the Assistant Attorney General in the Criminal Division of the Department of Justice, the officer designated by the Attorney General to approve such applications. Generally, the entire approval process takes from four to eight working days. The process for approving extension applications is similar to that for the initial

wiretap order, except that an extension application does not have to be reviewed by the FBI counsel's office. After the application is approved, it is submitted to a district court for approval and issuance of an order.

In the DiGilio investigation, the first electronic surveillance application approved was for the Zax apartment. The district court authorized the Zax surveillance and issued an order on October 1, 1981. Because an order authorizing electronic surveillance is valid for a period of no more than thirty days, see 18 U.S.C.A. § 2518(5) (West Supp.1992), the original order permitting surveillance upon the Zax apartment expired on October 31, 1981. Stewart did not seal any tapes upon expiration of that order. Instead, several days before October 31, 1981, Stewart drafted and applied for an extension of the order. He received approval and secured an order from the district court authorizing a thirty-day extension on November 3, 1981. At the hearing, Stewart explained that the gap between the expiration of the first order and the grant of the first extension order was the result of a delay in processing the necessary papers in Washington. The November 3 extension expired on December 3, 1981.

On December 21, 1981, eighteen days after the expiration of the first extension, Stewart obtained a second extension of the original Zax order. According to Stewart, the gap between the two extensions was the result of two factors. First, Stewart mailed the extension application to the Department of Justice expecting that it would be received on December 3 or 4, 1981, but the Department of Justice did not actually receive the papers until December 7, 1981. Then, on December 4, 1981, the FBI learned that DiGilio was going to be entering the hospital but this information was not confirmed until the following week. Therefore, immediately after the expiration of the first extension, it was unclear whether DiGilio was going to be entering the hospital and, if so, for how long. Knowing that DiGilio might be entering the hospital, Stewart did not want to obtain an extension for wiretapping the Zax apartment if DiGilio would not be there during the time of the extension. In fact, DiGilio entered the hospital on December 9, 1981 and returned from the hospital around December 21, 1981. Stewart's application for the second extension of the original Zax order was approved by the Department of Justice on December 16, 1981. The district court issued the second Zax extension order on December 21, 1981. This second extension expired on January 20, 1982.

In the meantime, on December 14, 1981, eleven days after the expiration of the November 3, 1981 extension, while in the process of seeking the second Zax extension, Stewart became concerned that DiGilio's hospital stay would be so long that it would no longer be "permissible to treat any subsequent order as being an extension of the earlier order." Jt.App. at 108. "Out of an abundance of caution," id., Stewart decided to seal the existing Zax tapes and directed the FBI to gather them for sealing. Because some of the tapes were at an FBI laboratory in Washington, D.C. for audio enhancement, an FBI agent went to Washington, D.C. to retrieve them. All 205 Zax tapes produced to date were gathered on December 15 and 16, 1981 and sealed on December 18, 1981.

Robins began to work on the DiGilio investigation shortly before the sealing of these 205 Zax tapes and, thereafter, took over the responsibility of applying for further extensions of the electronic surveillance orders and sealing tapes. When the second extension of the Zax apartment wiretap expired on January 20, 1982, Robins sought a third extension, but there was again a delay in the Department of Justice's approval of the request for the extension. In addition, the district judge supervising the investigation was away during the week of January 18, 1982. Approval from the Department of Justice was not received until January 27, 1982, and Robins applied for and received the order granting the extension on January 28, 1982. Thus, an eight day gap occurred between the second extension and the third extension of the Zax surveillance order.

The third and final extension of the Zax surveillance order expired on February 27, 1982. On March 9, 1982, the government sealed thirty-three of the Zax tapes. The government did not seal the 108 remaining Zax tapes until April 2, 1982. According to Robins, these 108 tapes were not sealed sooner because the FBI was making enhanced duplicates of them.

On January 28, 1982, the district court issued an order authorizing electronic surveillance of the Gallagher home. This order expired on February 27, 1982, and an extension was obtained on March 2, 1982. At the hearing, Stewart surmised that the reason for this two-day delay was that February 28, 1982 was a Sunday.

The first Gallagher extension expired on April 1, 1982. The court issued a second Gallagher extension on April 12, 1982. According to Stewart, authorization for the second extension was received from the Department of Justice on Friday, April 9, 1982, when the supervising judge was no longer available. This extension order expired on May 12, 1982. No further extensions were sought. All of the Gallagher tapes were sealed on May 17, 1982.

Six months later, on November 16, 1982, Robins received authorization from the court to conduct electronic surveillance at the office of attorney Larry Bronson. The Bronson order expired on December 16, 1982. Robins testified at the hearing that at that time the government was undecided about seeking renewal and, after deciding not to seek a renewal, sealed the tapes on

December 22, 1982, after a delay of six days.

On December 18, 1981, immediately after sealing, some of the 205 Zax tapes were unsealed so that their audibility could be enhanced in Washington, D.C. These tapes were resealed on April 2, 1982. On October 6, 1983, all of the Zax and Bronson tapes were unsealed in an effort to make more audible duplicates from the original tapes. The FBI and an outside consultant were brought in to do this work, and the unsealed tapes were kept in the Strike Force office. These tapes were not resealed until December 12, 1984, over one year after unsealing. Finally, on May 14, 1984, an unsealing order was obtained for duplicate copies of the Gallagher tapes so that they could be used at another trial. Inadvertently, Robins unsealed a box of original tapes and mistakenly used one original tape at this other trial. These accidentally unsealed tapes were also resealed on December 12, 1984.

### III.

### JURISDICTION & STANDARD OF REVIEW

The district court had subject-matter jurisdiction over the federal criminal prosecutions against Carson and Gallagher pursuant to 18 U.S.C.A. § 3231 (West 1985). We have jurisdiction over the final order of the district court denying Carson and Gallagher's motions to suppress the fruits of electronic surveillance pursuant to 28 U.S.C.A. § 1291 (West Supp.1992).[2]

---

**2.** The government seeks to dismiss Carson's appeal as untimely. Carson's formal notice of appeal from the district court's December 6, 1990 final order was filed on December 19, 1990, two days after the ten-day appeal period of Federal Rule of Appellate Procedure 4(b) had run. *See* Fed.R.App.P. 4(b), 26(a). However, on December 4, 1990, Carson's attorney wrote a letter to the district court judge that stated in relevant part:

I enclose herewith the original of Donald Carson's Application for *forma pauperis* status for purposes of appealing to the Third Circuit the order entered today which denied suppression of electronic surveillance and its fruits. Mr. Carson desires to appeal, and I believe that there are substantial grounds to appeal from the Court's assessment of the

"gap" issue and the Court's holding that Mr. Robins' conduct was objectively reasonable. In his response to the government's motion to dismiss for lack of appellate jurisdiction, Carson's attorney stated that he waited to file a formal notice of appeal until the district court acted on the *forma pauperis* application.

This letter contains all of the requirements of a notice of appeal. It specifies the party appealing, the order appealed from and the court to which the appeal is taken. *See* Fed.R.App.P. 3(c). Thus, the letter was the functional equivalent of a notice of appeal. *See Smith v. Barry,* — U.S. ——, 112 S.Ct. 678, 681–82, 116 L.Ed.2d 678 (1992). The method utilized here is not recommended, but we think the letter is sufficient to give us appellate jurisdiction over Carson's appeal.

We exercise plenary review over the legal issues relating to the sealing and unsealing of the tapes. *See United States v. Vastola*, 915 F.2d 865, 875 (3d Cir.1990) (*Vastola II*), *cert. denied,* — U.S. —, 111 S.Ct. 1073, 112 L.Ed.2d 1178 (1991). To the extent that we review the district court's factual findings at the hearing on remand, we can only overturn those findings that are clearly erroneous. *See United States v. McMillen*, 917 F.2d 773, 774 (3d Cir.1990). We review the district court's decision to allow the government to present additional evidence explaining the sealing delays on remand for abuse of discretion. *See Vastola II*, 915 F.2d at 876.

### IV.

### DISCUSSION

In this appeal, Carson and Gallagher claim that the electronic surveillance tapes that the government introduced against them at trial should have been suppressed because the government failed to seal the tapes immediately as required by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C.A. §§ 2510–2521 (West 1970 & Supp.1992). The relevant provision of the Act, section 2518(8)(a), states:

> The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section

2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.

18 U.S.C.A. § 2518(8)(a).

■ Section 2518(8)(a) requires that tapes be sealed "[i]mmediately upon the expiration of the period of the order, or extensions thereof." *Id.* The purpose of the sealing requirement "is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *Ojeda Rios*, 495 U.S. at 263, 110 S.Ct. at 1849. In *Vastola II*, we interpreted "immediately" to mean "as soon as was practical" and not *instanter. See Vastola II*, 915 F.2d at 875. If tapes are not sealed immediately, *i.e.*, as soon as administratively practical, they must be suppressed at trial unless the government can provide a satisfactory explanation for its failure to comply with the requirements of the subsection. *See Vastola II*, 915 F.2d at 870. This satisfactory explanation must be "objectively reasonable," *Ojeda Rios*, 495 U.S. at 266, 110 S.Ct. at 1851, and must "explain not only why a delay occurred but also why it is excusable," *id.* at 265, 110 S.Ct. at 1850. A satisfactory explanation is usually based on a mistaken view of the law on what triggers sealing, *see id.* at 266, 110 S.Ct. at 1851, but on occasion it can be supplied by an extraneous unforeseen emergent situation, *see, e.g., United States v. Massino*, 784 F.2d 153, 157 (2d Cir.1986).

■ Section 2518(8)(a) states that tapes must be sealed "immediately upon the expiration of the period of the order, *or extensions thereof.*" This represents a Congressional determination that tapes secured under one order need not be sealed while surveillance is being conducted under a related order that may be considered an "extension." While we have not heretofore so held, the most reasonable construction of this statute is that a second order need not be entered before the expiration

of the first in order to qualify as an extension so long as the subject, location and criminal subject matter of both surveillances is the same. The statute's authorization for extensions, section 2518(5), does not so limit "extensions" and such a limitation would seem an unduly arbitrary one. Where surveillance immediately produces sufficient evidence to warrant surveillance beyond a thirty day period, the new order would be an "extension." However, where a surveillance did not produce sufficient evidence to warrant an extension until too late to secure the necessary authorization before expiration of the first order, no such "extension" would occur.

■ We thus think it apparent that an "extension" under section 2518(8)(a) that postpones the necessity for the sealing of tapes includes some orders not entered before the expiration of a preceding order. At the same time, we think it equally apparent that, for purposes of section 2518(8)(a), not all orders authorizing surveillance of the same subject, at the same location, concerning the same criminal subject matter can constitute "extensions" of a prior order governing similar surveillance. If all orders, regardless of the amount of delay in their entry, were considered "extensions," the purpose behind requiring an immediate sealing of tapes would be frustrated. We are thus constrained to imply a temporal limitation on "extensions" under section 2518(8)(a) that will correspond to that sections's provision for "satisfactory explanations" of any failure to timely seal. Thus, we hold that an order authorizing surveillance of the same subject, at the same location, regarding the same matter as an earlier authorized surveillance, constitutes an "extension" of the earlier authorization for purposes of section 2518(8)(a) if, but only if, the new authorization was obtained as soon as administratively practical or any delay is satisfactorily explained, *i.e.*, is shown to have occurred without fault or bad faith on the part of the government.

■ Thus, there are two kinds of justifiable government delays under the statutory scheme. First, there are the relatively short delays necessitated by the process required to comply with the provisions of the Act; administrative delays for want of a better term. Second, there are the sometimes longer delays attributable to nonadministrative, objectively reasonable causes like understandable mistakes of law and interference from unexpected, extrinsic events beyond the government's control.

Because the government did not at once seal the tapes used against them on the expiration of each surveillance order or its extensions, Carson and Gallagher's hypothesis is that they must be suppressed. Their reasoning is syllogistic. They start from the premise that the government did not comply with the immediate sealing requirement of section 2518(8)(a). In doing so, they do not distinguish gaps between the expiration of a particular surveillance order and its extensions from the time interval between expiration of the last extension of a particular order and sealing. Thus, they contend that sealing is required immediately upon the expiration of each order and each extension. From their premise that the government failed to meet this undifferentiated immediacy requirement, Carson and Gallagher contend *Ojeda Rios* requires the government to provide a satisfactory explanation for the delay. Since the explanations offered are, in their eyes, not objectively reasonable, they contend they are unsatisfactory and therefore *Ojeda Rios* requires suppression of the tapes.

Our analysis will proceed as follows. First, we will determine whether any gaps in time between the expiration of a particular order and its extension are permissible and, if so, which of those in question here are permissible. With respect to any impermissible gaps, we will next determine whether the evidence shows that the government provided the district court with an objectively reasonable and satisfactory explanation for each interval between the expiration of a particular order and its succeeding extension. If so, we will go on to decide whether the district court addressed that explanation and found it reasonable. Second, we will determine whether any

tapes were not sealed immediately upon final expiration of an order. With respect to those that were not, we will again review the evidence to see if the government proffered an objectively reasonable and satisfactory explanation for the delay in sealing to the district court, and whether the district court addressed that explanation and found it reasonable. Thereafter, we will consider the unsealing problem and, finally, Carson and Gallagher's argument that all evidence obtained as a result of any improper surveillance must be suppressed.

### A.

#### *Gaps Between Orders, Extensions and Subsequent Extensions*

There are functional and practical differences between the decision to initiate or continue surveillance and the procedure and the mechanics required to seal tapes upon its termination. Therefore, in determining whether Carson and Gallagher's claims have merit, we must first distinguish gaps between an order and its extensions from delays between the expiration of all extensions for surveillance and sealing the tapes. With that distinction in mind, we first examine whether the law requires immediate sealing upon the initial expiration of each order without regard to its extension or whether, instead, an insignificantly brief gap in time between initial expiration and extension obviates the statute's "immediate" sealing requirement.

■ As the facts of this case demonstrate, authorization to initiate or extend a surveillance is a more complicated and time consuming process than obtaining a sealing order. The former requires a local United States Attorney to obtain executive approval through a multi-step bureaucratic process before seeking judicial approval. Conversely, a local United States Attorney

can obtain a sealing order simply by presenting the appropriate papers and tapes to the supervising judge. Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge, the record discloses no other necessary steps to sealing. Thus, as a practical matter, more time is needed to secure an extension than to obtain the sealing order the statute requires at the end of surveillance at any particular site. Since delays in sealing are permissible so long as the sealing is done "as soon as [is] practical," *Vastola II*, 915 F.2d at 875, we believe that certain delays dictated by the practicalities of securing an extension are also permissible. As the district court stated:

> [W]hen caused by administration difficulties, a brief hiatus between the expiration of an order and an extension will not prevent the extension from being deemed an "extension" within the meaning of § 2518(8)(a). Thus the obligation to seal would not arise until the termination of the final extension.

*Gallagher*, 751 F.Supp. at 493. We agree and so hold.[3]

With that conclusion in mind, we examine the particular expirations and extensions involved in this case. They are:

1. A two-day gap between the original Zax order and the first Zax extension;

2. A seventeen-day gap between the first Zax extension and the second Zax extension;

3. A seven-day gap between the second Zax extension and the third Zax extension;

4. A two-day gap between the Gallagher order and the first Gallagher extension; and

5. A ten-day gap between the first Gallagher extension and the second Gallagher extension.

---

**3.** The United States Court of Appeals for the Second Circuit has reached the same conclusion. *See United States v. Nersesian*, 824 F.2d 1294, 1305–06 (2d Cir.1987), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987) ("[t]he brief [three day] gap between the termination of the first wiretap order and the issuance of the second does not prevent the latter from being an extension of the former") (citing

*United States v. Vazquez*, 605 F.2d 1269, 1277–78 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979)). *But see Vazquez*, 605 F.2d at 1276 ("sealing delays are to be measured from the termination date of the *continuous* period of interception of a given telephone, regardless of the number or length of judicial orders that have been issued to authorize that surveillance" (emphasis added)).

Since no extension was ever granted for the Bronson order, we are unconcerned with that order in dealing with the gap issue.

Section 2518(8)(a) reflects the balancing of two concerns: protecting the integrity of electronic surveillance tapes while not unduly burdening government investigations. If Congress were concerned solely with the integrity of tapes, it could have required sealing after each day's surveillance. *See, e.g., United States v. Fury,* 554 F.2d 522, 533 (2d Cir.1977), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). A recognition that allowances must be made for practical realities is implicit in Title III. *See Vastola II,* 915 F.2d at 875 (using "as soon as practical" standard for immediacy).

We believe that delays in obtaining extensions, like delays in sealing, should be judged by practicality. As this case makes clear, the process of obtaining an extension is not solely within the control of the individuals supervising the investigation. Stewart and Robins had to rely on the action of officials in Washington, D.C. before they could request extension orders from the court. Therefore, we conclude that *Vastola II*'s "as soon as practical" standard also applies to extensions. *See Vastola II,* 915 F.2d at 875. As noted above, however, the practicalities of the two differ. Obtaining an extension order is more cumbersome than obtaining an order to seal. Of course, each extension must be evaluated on a case-by-case basis because, at some point, the delay in obtaining an extension must become fatal as a matter of law.[4]

Considering the practicalities involved in obtaining authority for an extension and securing the order granting it we do not think a gap of ten days will normally fail the statute's immediacy requirement, as we

have interpreted it in *Vastola,* insofar as extensions are concerned. We do not believe, however, that a delay of that magnitude in ultimately sealing the tapes will often satisfy the statute's immediacy requirement in that context. The practicalities are different and sealing is more readily accomplished since Washington's bureaucratic approval is not required for sealing.

Though *no* bright-line "x-day" test for distinguishing insignificantly brief from impermissible gaps was in effect while this surveillance was taking place, we believe the seventeen-day gap between the first Zax extension and the second Zax extension was unduly long. As a practical matter, that extension could have and should have been obtained sooner. We think approval of gaps of this length between the expiration of a surveillance order and its extension without requiring explanation would contravene the teaching of *Ojeda Rios* and threaten to obliterate any meaningful distinction between a gap in a particular surveillance and the termination of that surveillance.

On the other hand, considering the practicalities that counsel some relaxation of the immediacy requirement for intervals between initial expiration and extension, we think that in the remaining four instances the extensions were obtained as soon as administratively practical. Accordingly, the only questions with regard to the Bronson tapes, the Gallagher tapes and the Zax tapes made *after* December 21, 1981, are whether they were sealed as soon as was practicable after the expiration of the last extension, and if not, whether the government offered a satisfactory explanation as to why they were not sealed immediately.

With respect to the Zax tapes made *before* December 21, 1981, we must look to see if the government has proffered a sat-

---

**4.** Thus, we do not imply that the government is always entitled to a gap between extensions because of the practicalities involved. In some cases, the procedures for seeking an extension can be set in motion early enough so that Washington approval will be granted before expiration of the existing order or extension. In some cases, however, the surveillance team might decide to wait until a point near the end of the order or extension to file for an extension for good reason, for example, when it is questionable whether the current surveillance has given them sufficient probable cause to seek an extension or when it is not certain additional surveillance at a particular location will be of any practical benefit to the government in making its case.

isfactory explanation that is objectively reasonable. The district court excused the December 1981 seventeen-day gap by noting:

> The longer gap from December 4 to 20 was occasioned by John DiGilio's hospitalization and the resulting uncertainty whether the Zax apartment surveillance would be continued.

*Gallagher,* 751 F.Supp. at 493. The district court's finding that the delay was occasioned by uncertainty about DiGilio's hospitalization does not support its conclusion that the second Zax extension was procured as soon as was practical.[5] DiGilio's illness does not dictate the administrative practicalities inherent in securing an extension order. It was instead a judgment Stewart made to refrain from seeking an extension in the interest of convenience. Such a delay does not excuse a time gap between the expiration of an order and its extension because it is a circumstance removed from the practical process of *procuring* an extension. DiGilio's hospitalization involves an uncertainty about what course the underlying investigation will take that should require the government to decide promptly whether to seek or forego an extension. Seventeen days is too long to procrastinate over that decision.

Wisely, therefore, Stewart sealed the 205 Zax tapes on December 18, 1981 *before* the extension was secured. Thus, these 205 Zax tapes are admissible if they meet the *Vastola II* test of being sealed "as soon as practical" after the expiration of the first Zax extension on December 3, 1981, *see Vastola II,* 915 F.2d at 875, or if a satisfactory explanation explains any delay, *see Ojeda Rios,* 495 U.S. at 266, 110 S.Ct. at 1851. Accordingly, we turn to the subject of sealing.

### B.
### *Delays in Sealing and Satisfactory Explanations*

Because of our holding that only the seventeen-day gap between the two exten-

sions of the Zax order in December of 1981 has any bearing on the ultimate sealing requirement, the various expiration dates for purposes of deciding if the tapes in question were sealed in a timely manner are: December 3, 1981 (the expiration date of the first extension of the Zax order), February 27, 1982 (the expiration date of the final Zax order), May 12, 1982 (the expiration date of the final Gallagher order), and December 16, 1982 (the expiration date of the Bronson order).

In order to determine whether any of the tapes should have been suppressed because of delay in sealing, we must ask two questions. First, were they sealed "immediately" as we have defined that term in *Vastola II?* There, we construed "immediately" as used in section 2518(8)(a) to mean "the ... tapes should have been sealed either as soon as was practical after ... the actual surveillance ended, or as soon as practical after ... the final extension order expired." *Vastola II,* 915 F.2d at 875 (footnote omitted). If the tapes were sealed "as soon as was practical," our inquiry ends and the order of the district court denying Carson and Gallagher's motions to suppress must be affirmed with respect to those particular tapes because the government has complied with the sealing requirements of section 2518(8)(a) as interpreted in *Vastola II.* If not, we must ask whether the government has given a satisfactory explanation for the sealing delay that was objectively reasonable. *See Ojeda Rios,* 495 U.S. at 267, 110 S.Ct. at 1851; *Vastola II,* 915 F.2d at 870. If the government offers such an explanation, the tapes were admissible. If not, those tapes should have been suppressed at trial.

After the December 3, 1981 expiration of the first extension of the Zax order, all 205 of the Zax tapes thus far recorded were sealed on December 18, 1981. Since we have determined the next Zax order exten-

---

**5.** The district court did not determine whether the government's reason for waiting to seek an extension was a satisfactory explanation for the gap that was objectively reasonable. We would normally remand to the district court to hear the government out on this point. However, since we go on to hold that these tapes were properly sealed in any event, we will not remand for further proceedings on this issue.

·sion of December 21, 1981 cannot be treated as an extension of the previous Zax orders, these tapes should have been sealed as soon as practical after December 3, 1981. The district court did not determine whether the fourteen-day delay before the December 18, 1981 sealing was as soon as practical after December 3, 1981 because it found that all of the gaps between the initial Zax order and its several extensions were not fatal. Whether a sealing occurred as soon as practical after the expiration of an order is a question of fact for the district court. This record, however, is devoid of evidence that could support an inference that December 18, 1981 was the earliest practical date on which the tapes could have been sealed. Accordingly, we hold that the 205 Zax tapes recorded as of December 3, 1981 were not sealed "immediately" as required by section 2518(8)(a). It therefore becomes necessary to inquire whether the government has provided an objectively reasonable and satisfactory explanation for the fourteen-day delay in sealing the 205 Zax tapes. If it has not, these 205 tapes must be suppressed.

In *Ojeda Rios*, the Supreme Court outlined the contours of its requirement that delays in sealing electronic surveillance tapes must be satisfactorily explained. The Court observed that there are few cases where the government would be unable to put forth any explanation for a sealing delay. *Ojeda Rios*, 495 U.S. at 264, 110 S.Ct. at 1850. Therefore, "the Government [must] explain not only why a delay occurred but also why it is excusable." *Id.* at 265, 110 S.Ct. at 1850. The excuse offered must be "objectively reasonable" and must be the actual reason for the delay, "based on the evidence presented and submissions made in the District Court," and not merely a *post hoc* rationalization. *Id.* at 267, 110 S.Ct. at 1851. In remanding for a determination of whether the explanation presented by the government to the Supreme Court "substantially correspond[ed]" to its explanation to the district court, the Supreme Court stressed that "even though the misunderstanding now pressed by the Government was objectively reasonable, that explanation is not 'satis-

factory' within the meaning of the statute unless it was relied on at the suppression hearing to explain the sealing delays." *Id.*

Here, the district court determined that:
it is abundantly clear that Stewart's belief in 1981 and 1982 that a gap did not prevent a renewal order from constituting a statutory extension was a satisfactory explanation for a sealing delay. Applying *Rios*, his interpretation was objectively reasonable at the time and, for that matter, is still objectively reasonable.

*Gallagher*, 751 F.Supp. at 494. The record shows Stewart believed that a gap between the initial order and its extensions did not actually prevent the December 21, 1981 order from being considered as an extension. Stewart believed, however, that too long a gap might prevent the December 21, 1981 order from being treated as an extension; in fact, Stewart had these 205 Zax tapes sealed as a precautionary measure for this very reason on December 18, 1991, two weeks after the first extension expired. He wisely sealed the tapes even though he believed that a gap of up to thirty days would not prevent an order from being considered as an extension. He did so because "[b]eginning at ten days, ... I start to get nervous about what's going to happen in the future." Jt.App. at 79. Stewart's views about the acceptable lengths of gaps were based on his reading of section 2518(8)(a), some of the case law interpreting it and on analogy from his knowledge of time intervals between issuance and execution of warrants. Since the statute sets the duration of an electronic surveillance order at thirty days, Stewart in this instance chose thirty days as the outside limit for a gap, started the sealing procedure shortly after ten days had expired and secured the extension well within his thirty day benchmark.

The district court did not err in concluding that Stewart has provided a satisfactory explanation for the fourteen-day delay in sealing the 205 Zax tapes produced before the second extension of that order. Under the circumstances, we cannot say Stewart's explanation was not objectively

reasonable. Stewart's experience led him to think that a gap of less than thirty days between extension orders for electronic surveillance of the same premises would require sealing. He was mistaken, but *Ojeda Rios* makes it clear that pre-*Ojeda Rios* mistakes of law regarding when sealing is required will not be grounds for suppression. *See Ojeda Rios*, 495 U.S. at 266, 110 S.Ct. at 1851. Although these tapes were not sealed immediately, we are satisfied that the government offered a satisfactory explanation for the delay. Therefore, the 205 tapes which were sealed on December 18, 1981 were properly admitted at trial.

We next consider the March 9, 1982 sealing of thirty-three of the Zax tapes. This sealing occurred ten days after the February 27, 1982 expiration of the final Zax order. The district court did not determine whether these 33 tapes were sealed as soon as practical but instead assumed that the March 9 sealing was not immediate. *Gallagher*, 751 F.Supp. at 494. The district court did, however, conclude that the government provided satisfactory explanations for this sealing delay and that suppression was not warranted.

■ By the time these 33 tapes were sealed, Robins had taken over the responsibility for compliance with the statute's sealing requirements. In deciding that Robins' explanation was satisfactory, the district court examined the reasons he offered at the evidentiary hearing on remand from this Court. In *Vastola II*, we held that the government is entitled to present reasons for sealing delays after trial when it has not previously been on notice that such reasons were required. *See Vastola II*, 915 F.2d at 875. The government cannot, however, present new reasons for sealing delays when it has already given a reason for delay at the suppression hearing. *See Ojeda Rios*, 495 U.S. at 267, 110 S.Ct. at 1851.

Carson and Gallagher argue that the district court should not have considered any of Robins' explanations at the evidentiary hearing because he had already given an explanation for this sealing delay in a 1987

affidavit the government proffered in opposition to Carson and Gallagher's pretrial suppression motion. However, in this affidavit Robins explained the reason for the delay with respect to the *April 2, 1982 sealing*, not the March 9, 1982 sealing:

> The delay between the end of the last extension of the electronic surveillance Order on the Zax apartment, approximately March 1, and the sealing of the last tapes on April 2, 1982, was caused by the necessity of enhancing the original tapes by having experts in the Washington FBI Office make enhanced copies of those original tapes that had audibility problems. The tapes were submitted to the District Court for sealing soon after the final group was returned from Washington, D.C.

Jt.App. at 509. Since, Robins had not previously explained the reason for the March 9, 1982 delay in sealing, the district court did not abuse its discretion in considering his testimony at the evidentiary hearing to determine whether the government had a satisfactory explanation for the sealing delay.

At the hearing, Robins testified that he sealed 33 Zax tapes on March 9, 1982 for housekeeping purposes. In its brief, the government explains that Robins did not think he had a statutory obligation to seal the tapes on March 9, 1982:

> Robins discussed the sealing issue with Stewart, his supervisor, during the time in December 1981 when DiGilio was in the hospital. Although Stewart meant to convey that sealing was required at the end of a particular order or its extension, Robins understood him to mean that sealing was required only at the conclusion of the investigation, rather than at the end of interception at a particular location. Robins' misunderstanding of Stewart's advice arose, because at the time of their discussion the Zax order constituted the entire electronic surveillance operation.

Brief of Appellee at 22–23 (citation omitted). As a result, Robins believed that the sealing obligation for all of the tapes, including the Zax tapes, arose on May 12,

1982 when the Gallagher surveillance was terminated. *See Gallagher*, 751 F.Supp. at 494. The district court noted that the Supreme Court had accepted a similar rationale in *Ojeda Rios*, subject only to determination on remand that the reason the government advanced in *Ojeda Rios* at the appellate level was not a new justification. Accordingly, the district court here concluded:

> that Robins' view, though wrong, was objectively reasonable and that, therefore, the government has provided a satisfactory explanation for the delay in sealing the 33 tapes on March 9, 1982 and for the delay in sealing the 108 tapes on April 2, 1982.

*Gallagher*, 751 F.Supp. at 495. In reaching this conclusion, the court accepted Robins' explanation even though it was contrary to the unambiguous language of the statute. *See id.* at 494 (quoting *Vastola II*, 915 F.2d at 874).[6]

 We agree with the district court that a reasonable mistake of law can be a satisfactory explanation for delay, but we also think the district court's findings do not support its conclusion that Robins' explanation was satisfactory. For an explanation to be satisfactory under *Ojeda Rios*, it must be objectively reasonable. Robins' misunderstanding of the sealing requirement was not the same sort of mistake of law involved in *Ojeda Rios*, however. The government does not, and cannot, argue that an objective reading of the extant case law might have caused an objectively reasonable attorney to take Robins' view. Instead, it attempts to "satisfactorily explain" the delay by saying that it was not attributable to any fault on the government's part; rather, the government argues, it was attributable to an innocent mistake on Robins' part in misunderstanding what Stewart told him. We think a mistake of this sort is objectively reasonable only when the attorney involved acted as a "reasonably prudent" attorney would to investigate the legal question involved in a reasonably prudent manner. Robins said his conclusion that the sealing requirement was not triggered until all surveillance ended was based on a misunderstanding of Stewart's oral advice on the sealing requirements. The district court made no finding as to whether Robins could have reasonably understood Stewart as telling him no sealing was required until all surveillance ended or whether it was reasonable to rely on what Stewart told him without any independent research. If a reasonably prudent lawyer could have interpreted Stewart's statements as Robins did and, under all the circumstances, reasonably relied on them without any independent investigation of the law, Robins' explanation as to the March 9, 1982 delay would be an objectively reasonable mistake of law that satisfactorily explains the government's failure to meet the statute's requirement of immediate sealing. Affirmative answers to those two questions of fact are necessary to a determination that Robins' mistake of law was objectively reasonable. The record must therefore be examined to determine whether Robins acted as a prudent attorney in this situation.

Robins remembered having a conversation with Stewart concerning the sealing requirement in December of 1981, when Stewart was concerned about the gap in the Zax extensions when DiGilio was going

---

6. *Vastola II* states:

> Although the government rightly points out that *Rios* did not decide whether a change in the location of an illegal operation will prevent a subsequent order covering the new location from being an extension of a previous order, the statute unambiguously rules out this possibility.
>
> Section 2518(1)(b)(ii) plainly states that an application for a surveillance order must contain "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." In addition, section 2518(3)(d) requires a particularized showing of probable cause that "the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in the commission of [the] offense [under investigation]." Based on these two provisions alone, we would have no difficulty concluding that Congress intended for interception orders, and their accompanying extensions, to apply only to surveillances in the particular locations specified in the applications.

*Vastola II*, 915 F.2d at 874 (footnote omitted).

into the hospital. Robins also testified that the understanding of the sealing requirement that he obtained from that conversation guided his conduct of the investigation.[7] About this conversation, Robins testified:

With respect to the sealing, the discussion was that we had an obligation to seal the tapes at the end of the interception process which I took to mean the investigation, and that we would seal them promptly after the investigation process, and it would mean—at least it meant to me that we would do it within a reasonable time.

If you didn't do it within a reasonable time, which my understanding was we were talking about something like ten days or so, then you had to have a reason why you were not doing it within that time.

Jt.App. at 198. Robins therefore thought that so long as any part of the "wiretap interception process" was occurring, there was no requirement to seal—even if a particular wiretap operation which was a part of the investigation was complete.

With respect to this particular case, Robins believed that the obligation to seal occurred upon the expiration of the second extension of the Gallagher order on May 12, 1982 because this is when the wiretap investigation "ended for a fairly substantial period of time"—seven months before the order for the Bronson wiretap was obtained. He therefore thought that the last point at which the Zax and Gallagher tapes could be sealed was ten days after May 12, 1982, given the ten-day Stewart "grace period." During the investigation, neither Stewart nor Robins consulted the United States Attorney's Manual (Manual) about the law concerning electronic surveillance.[8] Stewart admitted he knew of the Manual's existence but testified that it only provided guidelines for action, and admitted that he did not consult it at any time during this investigation. Robins could not remember if he had read the Manual at the time of the investigation but admitted that "[u]pon reviewing it and seeing what actions I took, I think that I would agree that I did not rely upon it." Jt.App. at 264.

The circumstances of this case may show that Robins had an affirmative duty to do more than rely on the advice of his superior. Arguably, a reasonable attorney would not have risked the exclusion of the tapes, evidence important to his case, without personally checking the law relating to its admission. It is not always unreasonable for an attorney to rely on a reasoned oral opinion of a supervisor, or even that of a peer with more experience in the area of law in question. Moreover, an attorney working under another lawyer on a case could not be faulted for following instructions, as opposed to advice, from the person in charge of the case or investigation. On the other hand, we do not think that a reasonable attorney can rely on a casual conversation with a peer or supervisor concerning developing law on a complex, controversial subject if an incorrect answer is likely to preclude admission of evidence of vital importance to the case. These questions are essentially fact-bound and the district court has made no findings on them. Whether Robins acted reasonably in relying on what he thought Stewart told him in this case without independently checking the law must be decided by the district court in the first instance.

---

7. We note that Robins and Stewart had agreed on the insignificance of gaps of less than ten days between the expiration of orders and their extensions. In that respect, Robins stated that his conclusion was based on "[m]y review of the statute, my review, and probably conferring with Bob Stewart." Jt.App. at 203.

8. Though the Manual is not binding on United States Attorneys, it is designed to serve as a guide to their conduct, much as an attorney's commonplace book or digest served him and his associates in former days. A substantial portion of the Manual is devoted to the conduct of wiretapping investigations. The Manual states that sealing should occur "*[i]mmediately*" upon termination of the interception." Jt.App. at 430 (emphasis in original). It does not define "immediately" but clearly suggests that it means on the day of termination: "[i]f the failure to seal on the day of termination is foreseeable, the supervisory attorney should seek an order of the supervising judge extending the time for sealing." *Id.*

If the district court finds on remand that Robins' explanation was not objectively reasonable and therefore unsatisfactory, it can no longer assume the March 9 sealing of the 33 Zax tapes was "immediate." A finding will also be required on that issue. Therefore, we will remand the case to the district court for a determination of both the immediacy issue and the reasonableness of Robins' explanation that he relied on a misunderstanding of Stewart's advice. In making the former determination, the district court will again need to examine the circumstances and from them determine whether these 33 tapes were sealed "as soon as was practical." If so, their admission will have been proper. If not, the admission will stand or fall on whether Robins could have reasonably relied on his misunderstanding of the conversation with Stewart.

The district court also assumed the April 2, 1982 sealing was not immediate. We agree and believe any other conclusion would be legally incorrect on this record. "As soon as was practical" means as soon as is reasonably feasible given the administrative procedures which necessarily must be undertaken prior to sealing. The final Zax order expired on February 27, 1982, and it is virtually impossible to conceive of any necessary administrative delays that would make the April 2, 1982 sealing as soon as practical after the February 27, 1982 expiration of the last Zax extension. In his 1987 affidavit, Robins stated that this sealing delay was the result of some of the tapes having been sent to Washington, D.C. for audio enhancement. While the April sealing may have occurred "as soon as was practical" after the tapes were sent to Washington, it was improper for the government to send the tapes to Washington prior to their sealing. The government cannot delay sealing by unilaterally deciding to do something to the tapes before sealing that could just as easily be done after sealing pursuant to an unsealing order. Here, it could have easily sealed them first as the statute requires and then, if necessary, asked the court to unseal them for enhancement purposes.

Since the government did not seal these 108 Zax tapes immediately, section 2518(8)(a) requires their suppression unless the government offered a satisfactory explanation for the sealing delay. The district court concluded that the government did satisfactorily explain the sealing delay based on a finding that Robins' mistaken view that the sealing requirement did not become effective until the entire investigation ended was objectively reasonable. Robins presented this rationale for his sealing decisions for the first time at the evidentiary hearing the district court conducted on remand from this Court.

Carson and Gallagher argue that the district court erred in considering this testimony because Robins previously stated a different reason for the April 2, 1982 sealing delay in his 1987 affidavit. In that affidavit, Robins stated that the reason the tapes were not sealed until April 2, 1982 is because they were in Washington, D.C. for audio enhancement. *See supra* at 1493. We review the district court's decision to allow Robins to present additional evidence explaining the sealing delays for abuse of discretion. *See Vastola II*, 915 F.2d at 876.

At the evidentiary hearing, Robins, when confronted with the fact that his earlier affidavit made no reference to the fact that he did not think he had to seal the tapes until May of 1982 under section 2518(8)(a), responded that he didn't "remember that subject being a discussion of this affidavit." Jt.App. at 249. While Robins did state that he was aware of *Falcone* during the investigation, Robins did not claim at the evidentiary hearing that his reliance on *Falcone* caused him to fail to explain fully the rationale underlying the April 2, 1982 sealing in his 1987 affidavit.

 Robins' misconception of the law was *not* the reason relied on by the government at the original suppression hearing. Rather, it is a different reason newly advanced by the government and therefore falls within *Ojeda Rios'* prohibition of a second rationalization for a failure to seal. Given Robins' earlier explanation for the delay in his affidavit, we therefore conclude that the district court abused its dis-

cretion in considering Robins' second explanation at the evidentiary hearing concerning the April 2, 1982 sealing delay.

In this respect, *Ojeda Rios*, not *Vastola II*, is controlling. Indeed, *Vastola II* is readily distinguishable. In *Vastola II*, no explanation was given for the sealing delay at the initial suppression hearing. Therefore, we remanded to the district court for a determination of whether the government should be allowed to offer an explanation for the delay. *Vastola II*, 915 F.2d at 875. In so doing, we stated that the government's

> failure in the district court to offer evidence concerning the circumstances of the sealing delay should not necessarily now foreclose it from offering such evidence before the district court....
>
> ... In this case, while it is possible that the government offered no explanation for the delay because it had none, it is also possible that, acting in reasonable reliance on *Falcone*, it assumed that it could defeat the suppression motion by demonstrating the integrity of the tapes and thus did not find it necessary to introduce evidence on this point. Accordingly, we conclude that the district court should be entitled to exercise its discretion to decide whether the government should now be permitted, under *Rios*, to offer an explanation for its violation of the sealing requirement.

*Vastola II*, 915 F.2d at 875–76.

In *Ojeda Rios*, the Supreme Court remanded for the district court to determine "whether the Government's explanation to the District Court substantially corresponds to the explanation it now advances." *Ojeda Rios*, 495 U.S. at 267, 110 S.Ct. at 1851. The Supreme Court did not remand so that the government could present new reasons for the sealing delays.

This case differs from *Vastola II* because Robins *did* state a reason for the sealing delay in his earlier affidavit on suppression. To repeat, the crucial part of Robins' affidavit read:

> *The delay* between the end of the last extension of the electronic surveillance Order on the Zax apartment, approximately March 1, and the sealing of the last tapes on April 2, 1982, *was caused by* the necessity of enhancing the original tapes by having experts in the Washington FBI Office make enhanced copies of those original tapes that had audibility problems. The tapes were submitted to the District Court for sealing soon after the final group was returned from Washington, D.C.

Jt.App. at 50 (emphasis added); *see supra* at 1493. In *Vastola II*, we held that there was no significant difference between *Ojeda Rios*, where the government had provided an explanation to the district court for the delay but it could not be ascertained whether it was the same reason presently being pressed, and *United States v. Vastola*, 899 F.2d 211 (3d Cir.1990) (*Vastola I*), where the government had provided no earlier explanation for the delay. Accordingly, we held the government could explain the reasons for the delay on remand. *See Vastola II*, 915 F.2d at 875. In the present case, however, the government did give a prior explanation for the sealing delay, and the district court incorrectly allowed the government to change its explanation at the hearing on remand. Thus, our case falls directly within the Supreme Court's prohibition of second rationalizations.

■ Since the government cannot use Robins' belated recollection of his conversation with Stewart to explain the 34–day delay in sealing 108 of the Zax tapes, we must now determine whether a 34 day delay in sealing for the purposes of audio enhancement is a satisfactory explanation for the sealing delay. We conclude, as the district court assumed, that it is not. Section 2518(8)(a) serves a prophylactic function. It precludes the government from using an electronic surveillance wiretap that has not been timely sealed under judicial supervision. Robins should not have given control of the tapes to officials in Washington for audio enhancement for a period of more than a month after the last Zax extension expired without first presenting them to the district court for sealing and then requesting that they be unsealed. To permit such a long delay for

enhancement defeats the prophylactic purpose of section 2518(8)(a)'s immediate sealing requirement. In general, satisfactory explanations for delays in sealing should relate directly to the practicalities of obtaining a sealing order as soon as possible after the sealing requirement is triggered. *See, e.g., Ojeda Rios*, 495 U.S. at 266, 110 S.Ct. at 1851 (objectively reasonable misconception of law regarding the triggering of the sealing requirement is a satisfactory explanation); *Vastola II*, 915 F.2d at 875 n. 17 ("government's clerical error in storing the original tapes constituted a satisfactory explanation for the delay"); *see also United States v. Massino*, 784 F.2d 153, 157 (2d Cir.1986) (review of cases where government had satisfactory explanation for sealing delay).

We recognize that there may be limited special circumstances apart from the administrative practicalities of obtaining a sealing order that would justify some delay. In *Massino*, the Second Circuit held that a necessary diversion of manpower to investigate leaks of confidential information about an electronic surveillance operation was a satisfactory explanation for a delay in sealing tapes obtained during that investigation. *See Massino*, 784 F.2d at 158. Conceding that the case was close, *id.* at 157, the *Massino* court reversed a district court determination that the explanation for the delay was not satisfactory because it was not due to administrative difficulties directly relating to sealing. In determining that the reason for the delay, not its relationship to the sealing process, is what should govern the acceptability of an explanation, the court stated:

> Judicial concern over a decision to divert resources from the sealing process is fully justified. However, the appropriateness of such a diversion depends upon the reasons given for it. Section 2518(8)(a) imposes an affirmative duty on the prosecutor and the government, and the failure to institute efficient procedures and to provide adequate personnel, cannot excuse a failure to comply with that duty. However, it is overly harsh to suppress highly probative evidence automatically because the proffered excuse

> involves a decision to divert resources from the sealing of tapes, without any weighing of the underlying need for that decision.

*Id.* (citation omitted).

The situation in this case is not analogous to that in *Massino*. In *Massino*, there was an unexpected, urgent need for investigation of a damaging leak. Such a situation is unusual and unforeseeable. By contrast, the need to enhance tapes is readily foreseeable and could just as readily become routine. Robins could have sealed the 108 Zax tapes and then applied for an unsealing order as was done for some of the tapes sealed on December 18, 1981. Moreover, the delay in sealing which occurred as a result of the audio enhancement of these 108 tapes was over a month. The length of a sealing delay is a relevant factor in considering whether an explanation is satisfactory. *See id.; United States v. McGrath*, 622 F.2d 36, 42 (2d Cir.1980). Given the length of the delay, the explanation for the April 2, 1982 sealing delay is unsatisfactory. Because the 108 Zax tapes were not immediately sealed and because the government did not satisfactorily explain this delay, these tapes should have been suppressed at trial.

Finally, we consider the sealing of the Gallagher and Bronson tapes. The final Gallagher order expired on May 12, 1982. The Gallagher tapes were sealed on May 17, 1982. When the intervening weekend is considered, there is no indication in the record that the tapes were not sealed as soon as was practical. *See Vastola II*, 915 F.2d at 875. Therefore, we hold that the Gallagher tapes were sealed immediately, in compliance with section 2518(8)(a), and thus properly admitted at trial.

Similarly, we conclude that the Bronson tapes were sealed immediately. The Bronson order expired on December 16, 1982, and the tapes were sealed on December 22, 1982. Again, this gap includes an intervening weekend. *See Gallagher*, 751 F.Supp. at 496. Therefore, the Bronson tapes did not have to be suppressed at trial.

## C.

### Unsealing and Delays in Resealing Tapes

Having addressed the issues before us concerning the initial sealing of the tapes, we must now examine the circumstances surrounding their unsealing. Carson and Gallagher contend that the sealing requirements of section 2518(8)(a) apply not only to initial sealings but also to resealings. Therefore, they argue that in the face of the long periods between the unsealings of the tapes and their resealings, the government must have satisfactory explanations for the resealing delays. Carson and Gallagher maintain that there are no such satisfactory explanations in this case and that therefore the tapes should have been suppressed at trial.[9]

The government contends that we are bound by our decision in *Vastola II* on this issue and that the tapes were properly admitted because the district court found that their physical integrity had not been compromised. In *Vastola II*, the government obtained unsealing orders for electronic surveillance tapes. *Vastola II*, 915 F.2d at 867. The terms of the unsealing order provided that the tapes remain in the custody of the government. *Vastola I*, 899 F.2d at 238. The government, however, gave the tapes to an audio enhancement expert in violation of the custody requirements of the unsealing order.[10] *Id.* This violation was challenged as a violation of section 2518(8)(a) requiring the suppression of the tapes. We concluded that the tapes did not have to be suppressed and that all that was required was proof of authenticity and proof that the government did not manufacture the unsealing for purposes of

tactical gain. *Vastola II*, 915 F.2d at 873. In holding *Ojeda Rios* inapplicable to violations of unsealing orders, we stated that "we would be hard pressed to find that Congress required anything more than proof of authenticity where the custody requirements of unsealing orders technically have been violated." *Id.* (footnote omitted). We reached this conclusion relying largely on the fact that "even in the case of judicially sealed tapes, violation of the *statutory* mandate that 'custody of the recordings shall be wherever the judge orders,' does not trigger the suppression remedy." *Id.* (emphasis in original).

In *Vastola II*, after concluding that section 2518(8)(a) did not apply to custody requirements of unsealing orders, we determined that even were section 2518(8)(a) to be applied to unsealing, the government's actions in that case would not require suppression. *Id.* In so concluding, we applied the test set forth by the court in *United States v. Angiulo*, 847 F.2d 956 (1st Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988):

> If the unsealing of such tapes is challenged in a motion to suppress, the government should be required to prove (1) that the unsealing and use of the tapes did not result in alterations or tampering and (2) that the circumstances necessitating unsealing were not manufactured for tactical gain and that the defendants will not be unduly prejudiced as a result of the unsealing.

*Vastola II*, 915 F.2d at 873 (quoting *Angiulo*). Although *Angiulo* was decided prior to *Ojeda Rios*, we held that it remained persuasive because the First Circuit had adopted the *Ojeda Rios* standard in 1986.

**9.** We do not think that Robins' mistaken use of some original tapes at another trial and the unsealing of some original tapes warrants their suppression. We also do not consider the unsealing of tapes for use at the other trials to warrant their suppression. Any undue delay in resealing these tapes, may however, warrant this remedy.

**10.** The appellants try to distinguish *Vastola II* from the present situation by claiming that "*Vastola II* only addressed the situation where

the tapes were unsealed for an undeniably proper purpose: use at trial." Brief for Appellant Gallagher at 48; Brief for Appellant Carson at 25. Gallagher concedes that the unsealing of tapes for use at trial is a purpose for which unsealing is proper. Brief for Appellant Gallagher at 48. However, the alleged violation of section 2518(8)(a) at issue in *Vastola II* was the release of the tapes by the government into the custody of an audio enhancement expert for enhancement and authentication. *Vastola I*, 899 F.2d at 238.

*See id.* *Vastola II* compels this panel to apply the *Angiulo* test to the present case.

In its opinion, the district court commented that "[a]t a hearing held prior to the trial in this case I found that the government had established the authenticity and integrity of the tapes. The evidence at trial confirmed that conclusion." *Gallagher*, 751 F.Supp. at 496. The government introduced extensive evidence at trial concerning the authenticity of the tapes. Ginsburg, the audio enhancement expert who worked on the tapes, testified that the enhancement process in no way alters the original tapes; instead, the process results in a copy of the original that lacks distracting background noises. The authenticity of the tapes is, of course, a question of fact. Therefore, the district court's finding that they were authentic must stand unless it is clearly erroneous. We hold that it was not.

The district court did not address the second prong of the *Angiulo* test, namely whether the unsealing was done for tactical gain. While the court in *Vastola II* reached a determination on this prong on its own, *Vastola II*, 915 F.2d at 873, we think that the district court should have the first opportunity to decide this issue in the present case. On remand, therefore, the district court should make findings on whether the unsealing was manufactured for the government's tactical gain and, if so, whether Carson and Gallagher were prejudiced by this unsealing. We note, however, that the government's violation of *Angiulo*'s second prong would require a finding that the prosecutor's actions approached a level analogous to bad faith. As we have already stated, the district court's findings on the delay in sealing imply a total absence of subjective bad faith and there is no basis on this record to find otherwise. Nevertheless, we think the question of whether the prosecutors had any other state of mind with respect to the unsealing is for the district court in the first instance.

---

11. Appellant Gallagher also raises this argument by way of Federal Rule of Appellate Procedure

## D.

### *Suppression of Tapes and Fruit of the Poisonous Tree*

 In the conclusion section of his brief, appellant Carson claims that not only should the surveillance tapes have been suppressed, but that "inasmuch as the searches which yielded Government Exhibit 811 and dominated the grand jury proceedings were indelibly tainted with the fruits of this unlawful electronic surveillance, the district court should be directed to dismiss the indictment with prejudice." Brief for Appellant Carson at 25.[11] We are unable to consider this argument because the record is silent as to which of the tapes, if any, were presented to the grand jury and, if so, which of those tapes were relied upon by the grand jury in returning the indictment. The record is also silent as to what evidence, if any, was procured as a "fruit" of the suppressed tapes. Finally, the record is silent as to whether this argument was presented to the district court and properly preserved for appellate review.

We believe that the district court is in the best position to address these issues, providing they have been properly preserved by the parties, and we will therefore remand to the district court to decide in the first instance what impact, if any, suppression of these tapes has on the indictment itself or on any of the other evidence presented at the trial by the government. We note that in *Vastola II*, we expressly reserved this issue for future decision and it remains an open question. *See Vastola II*, 915 F.2d at 876–77.

## V.

### CONCLUSION

 In summary, we conclude that brief gaps between the expirations of orders and their extensions do not trigger the sealing requirements of section 2518(8)(a), that the determination of whether a partic-

---

28(i).

ular gap is insignificantly long depends on the circumstances and is thus a question of fact for the district court, and that none of its findings that these gaps were insignificant are clearly erroneous except for its finding on the gap between the expiration of the first Zax extension order on December 3, 1981 and the second Zax extension order on December 21, 1981. We believe that delay prevents treatment of the December 21, 1981 order as an extension of the previous November 3 authorization to continue surveillance. Therefore, 205 of the Zax tapes should have been sealed as soon as practical after December 3, 1981. As to them, however, we conclude that the district court's finding that the government has advanced a satisfactory explanation for the delay is not clearly erroneous. Thus, the 205 Zax tapes which were sealed on December 18, 1981 did not have to be suppressed at trial. We will, however, remand this case for a determination of whether the March 9, 1982 sealing of thirty-three Zax tapes was done as soon as practical after February 27, 1982 and, if not, whether Robins' explanation was satisfactory and objectively reasonable.

The April 2, 1982 sealing of the remaining Zax tapes was clearly not immediate and the government has not provided a satisfactory explanation for this delay. The 108 Zax tapes which were sealed on this date should have been suppressed at trial.

Since the Gallagher and Bronson tapes were sealed as soon as was practical, they were properly admitted. On remand, the district court should determine whether the second prong of the *Angiulo* test, as set forth in *Vastola II*, was met with respect to the unsealing of these tapes for enhancement.

After the district court has resolved the issues open on remand, it should determine whether the contents of the 108 Zax tapes that were improperly admitted, and the contents of any other tapes the district court may determine should have been excluded, are such that the admission of the tapes was harmless error under whatever standard is appropriate. If not, then the district court should grant Carson and Gallagher new trials. The district court should also determine whether any of the suppressed tapes were relied upon by the grand jury in returning the indictment and, if so, what impact, if any, suppression has on the validity of the indictment, provided this issue has been properly preserved by the parties. Finally, the district court should determine what evidence was procured by the government as a result of suppressed tapes and whether the introduction of such evidence was harmless error, again applying whatever harmless error standard is appropriate, or requires a new trial.

The district court's judgment will be vacated and the case remanded for further proceedings consistent with this opinion.